McCULLOUGH v. BROWN. 1

STATE v. JACOBS.

SAME v. TROEGER.

SAME v. FAGAN.

SAME v. BYRD.

SAME v. DAVID.

1. ABSTRACT QUESTION.—Whether a statute, passed since these appeals were taken, and brought by the attorney general to the attention of the court, rendered the questions here presented abstract propositions of law, not considered, no motion being made.
2. STATUTES—CONSTITUTIONALITY.—The presumption is always in favor of the constitutionality of an act of the legislature, and a reasonable doubt must be solved in favor of the validity of the statute ; and in all cases the constitutionality of a State statute, unlike an act of Congress, must be sustained, unless it is forbidden by some provision, expressed or necessarily implied, in the State or Federal Constitution.
3. DISPENSARY ACT—SALE OF LIQUORS.—The "Act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided" (21 Stat., 62), commonly called the "Dispensary Act," was intended to put the manufacture and sale of liquors within the limits of this State, for any purpose whatsoever, exclusively in the hands of State officers, and for the purpose of realizing a profit to the State and its subordinate governmental agencies on such monopolized traffic.
4. PROPERTY RIGHT—LIQUORS—POLICE POWERS.—Under the Constitution of

---

1 These cases have been overruled in the case of State *ex rel.* George *v.* City Council of Aiken, filed October 8, 1894, and to be reported in 42 S. C. Rep.

this State, every person has the inalienable right of acquiring, holding, and disposing of property, of which right he may not be deprived but by the judgment of his peers or the law of the land; and, therefore, liquor being property, and the sale of liquor not *malum in se*, it is a lawful subject of commerce, and the traffic in this property cannot be taken away from the individual, except where the State, in the exercise of its police powers, declares such traffic to be unlawful.

5. DISPENSARY ACT—POLICE POWERS.—But as the Dispensary Act does not prohibit the sale of liquors (which the State has the clear right to do), and, on the contrary, encourages such sale by providing for purchases and sales by the State alone, not only within the State, but also beyond its limits, at a profit to the State and to its governmental agencies, the act is a statute to raise revenue and not a statute of prohibition, and, therefore, cannot be sustained as an exercise by the State of its police powers.

6. IBID.—IBID.—DUTY OF COURTS.—Whether a statute has been enacted in the exercise of the police powers of the State is not to be finally determined by the legislature, but it is the duty of the courts to say whether the limits allowed to the legislature by the Constitution have been exceeded.

7. IBID.—IBID.—SALE OF LIQUORS.—An act which does not prohibit the sale of liquors generally, under the State's undoubted right so to do, inasmuch as it provides for sales by the State itself through its own officers, is not a regulation of sales by private persons. And a regulation by the State of the duties of its own officers is not the exercise of the police power, nor can such power justify the prohibition of the sale of liquors by persons under the plea of regulating its sale by the officers of the State, when all such regulations could as well apply to sales by others.

8. IBID.—IBID.—IBID.—MONOPOLY.—The conceded right of a State to prohibit the sale of intoxicating liquors as injurious to society does not give to the State the right to take to itself a monopoly of the liquor traffic within its territorial limits.

9. IBID.—IBID.—IBID.—LEGISLATIVE POWER.—The Constitution of this State imposes several restrictions in terms upon legislative power, declares that the enumeration therein of rights "shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people," and vests "the legislative power of this State" in the General Assembly. *Held*, that this power thus vested was limited to the purposes of civil government, which do not include trade in any article of commerce, and, therefore, the General Assembly is without power to embark the State in the business of buying and selling liquors for profit.

10. IBID.—IBID.—IBID.—IBID.—The constitutional power of the State to carry on the business of banking, and to establish a State college, distinguished from the asserted right to trade in liquors.

11. CASES CRITICISED.—This case must be governed by the principle decided

in Mauldin *v.* Greenville, 33 S. C., 1, and is not affected by the decision in State *ex rel.* Hoover *v.* Town Council of Chester, 39 S. C., 307.

12. TAXPAYERS—INJUNCTION is a proper remedy by taxpayers seeking to enjoin persons from carrying on a business involving the expenditure of money raised by taxation, where the authority to carry on such business depends wholly upon an unconstitutional statute.

MR. JUSTICE POPE *dissenting.*

Before HUDSON, J., Darlington, July, 1893, and Richland, October, 1893.

The case first stated was an action for injunction. The complaint was as follows:

The complaint of the above named plaintiffs respectfully shows to this court:

*First.* That Charles S. McCullough is a resident and freehold voter of the town of Darlington, and a taxpayer of the said town and county of Darlington and the State of South Carolina; and that J. Witherspoon Evans is the town clerk of the town of Darlington, and a taxpayer of the county of Darlington and State of South Carolina, and that this action is brought on behalf of themselves and other freehold voters and taxpayers of the town and county of Darlington too numerous to be made parties to this action.

*Second.* That the General Assembly of the State of South Carolina has recently, to wit: on or about the 24th day of December, 1892, passed an act, entitled "an act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided;" which said act was approved December 24th, 1892.

*Third.* That the said act is unconstitutional, null and void, as follows, to wit: *a.* Because said act is in violation of and repugnant to section 8, article 1, of the Constitution of the United States. *b.* Because the said act is in violotion of and repugnant to article 7 of the additions to and amendments of the Constitution of the United States; and also sections 11 and 14, article 1, of the Constitution of the State of South Carolina. *c.* Because the said act is in violation of and repugnant to article 5 of the additions to and amendments of the Constitution

of the United States. *d.* Because the said act is in violation of and repugnant to sections 1 and 4, article 9, of the Constitution of the State of South Carolina. *e.* Because the said act is in violation of and repugnant to the Constitution of South Carolina, in that under the Constitution the State is invested with no power or right to trade in intoxicating liquors for revenue, to the exclusion of the citizens of this or other States of the United States; and because the said act does not lie within the police power reserved by the people to the State of South Carolina.

*Fourth.* That under and pursuant to the provisions of the said act, the said Geo. Just Brown, J. P. Kirven, and W. P. Carter, defendants above named, have been duly appointed as the county board of control for the county of Darlington.

*Fifth.* That on the 29th day of May, 1893, the said board of control met at their office in the town of Darlington, and among other things appointed Wednesday, the 7th day of June, 1893, as the day upon which applicants for the position of county dispenser should file their respective petitions, as required by the provisions of the said act, and that due notice of the same was given to the public.

*Sixth.* That on the appointed day, to wit: the 7th day of June, 1893, one John Buckner Floyd, the defendant above named, filed his petition for appointment as county dispenser with the said board of control, a copy of which said petition (marked exhibit A) is hereunto annexed as a part and parcel hereof, and to which plaintiffs ask to be allowed to refer as often as they may desire or deem necessary.

*Seventh.* That on the said 7th day of June, 1893, the said John Buckner Floyd filed in the office of the clerk of the court for Darlington a paper purporting to be a true copy of his petition to the said county board of control, a copy of which said paper (marked exhibit B) is hereunto annexed as a part and parcel hereof, and to which plaintiffs ask to be allowed to refer as often as they may desire or deem necessary.

*Eighth.* That thereafter, to wit: on the 17th day of June, 1893, the said county board of control met at their office, in the town of Darlington; and, notwithstanding the protests of

the plaintiffs, proceeded to and then and there did unlawfully appoint the said John Buckner Floyd dispenser.

*Ninth.* Plaintiffs are informed and believe that thereafter, to wit: on the 22d day of June, 1893, the said John Buckner Floyd filed with the said county board of control a paper signed by himself as principal, and T. A. Floyd and Mary J. Libbey as sureties, purporting to be his bond, as required by the said act, a copy whereof is hereunto annexed (marked exhibit C), and to which reference is prayed as often as may be necessary. That the said T. A. Floyd justified on the said bond, but that the said Mary J. Libbey did not justify. That thereupon the said county board of control approved the said bond, and issued to the said John Buckner Floyd such permit to sell intoxicating liquors as is provided for by said act.

*Tenth.* Plaintiffs are informed and believe that T. A. Floyd is a married woman, and that the said Mary J. Libbey is irresponsible, and that, therefore, the said John Buckner Floyd has failed to execute and file such a bond as is required by the provisions of said act.

*Eleventh.* Plaintiffs are informed and believe that the following named persons were on the 7th day of June, 1893, and now are freehold voters of the town of Darlington, whose freehold interest lies within the corporate limits of the town of Darlington, viz: [here follows 125 names.] And that the following named persons, who were on the 7th day of June, 1893, and are now freehold voters of the town of Darlington, whose freehold interest lies without the corporate limits of the town of Darlington, viz: 1, G. W. Dargan; 2, R. W. Boyd; 3, N. L. Harrell; 4, W. L. Galloway; 5, H. E. P. Sanders; 6, W. F. Dargan; making a total of 131 freehold voters of the said town of Darlington. That the said W. J. Alexander has recently, and subsequent to the said 7th day of June, 1893, departed this life.

*Twelfth.* Plaintiffs are informed and believe that the names of eighty persons are signed to the said petition of the said John Buckner Floyd, as by reference thereto will more fully appear. That seventeen of the persons whose names appear signed to the said petition, are not freehold voters of the town

of Darlington, viz: Jesse Williams, Adam Bristo, G. H. Hanford, J. D. Gillespie, F. E. Norment, N. S. Kirby, W. H. Smyrl, W. J. Taylor, E. W. Sutton, W. J. Harllee, A. E. Smalls, W. M. B. Sanders, John M. Waddill, B. Block, H. J. LaMotte, A. M. Hill, and A. Weston, jr. That the names of two persons which appear on said petition, viz: Moses Smalls and William Sumney, were not signed by the said parties, nor did the said Moses Smalls and William Sumney authorize any one, either in writing or by word of mouth, to sign their names to the said petition. That three persons whose names are signed to the said petition, viz: Ed. McIver, J. C. McCurry, and Ben McCurry, did not read the said petition before signing, and did not understand the same. That five persons whose names appear on said petition, viz: Pinkney Scott, Joe Roper, P. E. Cooper, M. D. Jacobs, and Derry Goodson, did not sign the said petitition, either by writing their names or by making their marks, and neither read or understood the same. That Fletcher McIver made his mark to the said petition, but neither read or understood the same. That there is no such person as A. J. McCurrie, which name appears on the said petition. That after properly striking off the said petition the names of the above mentioned persons, which are improperly there, and which appear on the said petition by mistake, there will remain upon the said petition of the said John Buckner Floyd only fifty names.

*Thirteenth.* That the said petition of the said John Buckner Floyd and the signatures thereto fail to comply with the requirements of the said act, as plaintiffs are informed and believe.

*Fourteenth.* That plaintiffs are informed and believe that the defendant, John Buckner Floyd, intends to open the dispensary for the sale of intoxicating liquors in the town of Darlington, under and by virtue of his said permit and the provisions of the said act, and that he will do so on the first day of July next ensuing, to the great damage of the citizens and freeholders of the town of Darlington, unless restrained by proper authority.

*Fifteenth.* That the plaintiff, Charles S. McCullough, is a free-

hold voter of the town of Darlington, and the plaintiff, J. Withersoon Evans, is the clerk of the town. That the plaintiffs, at a mass meeting of the citizens of the town of Darlington, were appointed as a committee to make up a list of the freeholds of the town, to inspect the petitions of applicants for county dispenser, and to see that they complied with the law. That this action is brought on behalf of the freeholders of the town of Darlington.

Wherefore, plaintiffs pray: That the said act be declared unconstitutional, null and void. That the permit issued to the said John Buckner Floyd authorizing him to sell intoxicating liquors be declared null and void, and that the said board of control be directed to cancel the same. That the defendants, Geo. Just Brown, J. P. Kirven, W. P. Carter, and John Buckner Floyd, be perpetually restrained and enjoined from opening and establishing a dispensary in the town of Darlington. That the said John Buckner Floyd be perpetually enjoined and restrained from opening and establishing a dispensary in the town of Darlington; and for such further relief as to this honorable court may seem proper.

This complaint was duly verified. The answer of J. B. Floyd was as follows:

The defendant, J. Buckner Floyd, upon whom has been served an order in the above stated action to show cause, together with his codefendants, Geo. Just Brown, J. P. Kirven, and W. P. Carter, before his honor, J. H. Hudson, judge of the fourth judicial circuit, why the said Geo. Just Brown, J. P. Kirven, and W. P. Carter should not be restrained from granting to him and to any other person a permit to sell intoxicating liquors in the town of Darlington; and further, why he should not be perpetually restrained and enjoined from opening and establishing a dispensary at Darlington or elsewhere, under any permit issued to him by the said Geo. Just Brown, J. P. Kirven, and W. P. Carter, being duly sworn, deposes and shows cause as follows:

1. That under and pursuant to an act of the General Assembly of the State of South Carolina, entitled "an act to prohibit

the manufacture and sale of intoxicating liquors as a beverage within this State except as herein provided," approved December 24th, 1892, as alleged and admitted in the complaint in said action, his codefendants, Geo. Just Brown, J. P. Kirven, and W. P. Carter, were heretofore duly appointed as the county board of control for the county of Darlington, and charged with the duty of appointing in their discretion, in accordance with the provisions of the said act, a county dispenser for Darlington County; that the said board having, as alleged in the said complaint, complied with the said prerequisites imposed by the said act, on the 17th day of June last past, met in their office in the town of Darlington, and in the exercise of the power and discretion vested in them by the said act, duly appointed this deponent as county dispenser for the said county; that thereafter this deponent executed his bond with sureties to the county treasurer for Darlington County, as required by the said act, and deposited the same with said county treasurer; and thereafter, this deponent having taken and subscribed the oath required by said act, and endorsed the same on the said bond, the said county board of control, on the 22d day of June last past, duly issued to this deponent a permit in accordance with the said act, a copy of which said permit is hereto attached and marked exhibit A, and the original is herewith submitted for the inspection of his honor.

2. That if the said board of control exceeded their powers in the said appointment, or committed error of law in making the same, such excess of power, or such error of law, cannot be considered in this action, being only cognizable and determinable by the Court of Common Pleas under a writ of *certiorari.*

3. That if the legality and validity of the said appointment could be questioned in this action, plaintiffs in their complaint have laid no ground or foundation therefor, inasmuch as they allege against the said appointment only error of fact.

4. That if the appointment of deponent had been illegal, or subject to just exception for any cause, the said act provides a remedy therefor by proper showing before the said county board, and in case of an illegal or an improper disregard of such showing by said county board, then by complaint to the State

board of control, having power under said act to remove a county board for cause, and deponent respectfully submits that said statutory remedy is exclusive in its character; that no resort has been had to said statutory remedy against deponent by plaintiffs, or by any one else.

5. That the said action, as far as this deponent is concerned, is for the purpose of trying his title to the office of county dispenser, and deponent respectfully submits that said title can be put in question only in an action in the nature of a writ of *quo warranto*, as provided for in section 428 of the Code of Civil Procedure, and in the following sections thereof, relating to said action.

6. That this action, though not in form, is, in fact, a suit against the State of South Carolina, inasmuch as it seeks to enjoin the sale of liquors, the property of the State, by the State, through its officers, in the county of Darlington, and it is respectfully submitted that the court is without jurisdiction to entertain such an action.

7. That plaintiffs' complaint does not state facts sufficient to constitute a cause of action.

8. That plaintiffs are not entitled to the injunction prayed for, even upon the supposition that the court has jurisdiction of the action, for the reason that they have failed to allege irreparable damage to themselves, and in alleging damage, have failed to state any facts upon which said allegation could be predicated; further, deponent alleges that if any injury be probable or possible to plaintiffs by the operation of a dispensary in the town of Darlington by this deponent, such injury would, and could, only be public in its nature, and suffered by them in common with all other members of the community, and it is respectfully submitted that a court sitting in equity will not interfere to prevent such injury; the remedy therefor being wholly legislative and governmental.

9. That the court sitting in equity will not interfere by injunction to restrain a person from the exercise of the functions of a public office on the ground of the illegality of the law under which his appointment was made, and will not permit itself to

be made the forum for determining disputed questions to public office.

10. That, pending the question of the validity of his appointment, it would be contrary to the rules and precedents of a court sitting in equity to stay the State of South Carolina in one of its functions, and to prohibit deponent, who is at least an officer *de facto*, from the discharge of the duties of his office.

11. That there is now lying in the depot at Darlington, for delivery to this deponent, as county dispenser as aforesaid, about one thousand dollars' worth of liquors, belonging to the State of South Carolina, forwarded to the deponent to be sold by him as dispenser; and he is in possession of a storehouse in the town of Darlington, leased by the county board of control for the term of one year, commencing from the first day of July, instant, at a rate of three hundred and fifty dollars, payable in quarterly instalments, for his use as such dispenser; and further, he is in possession of a United States internal revenue license for the sale of liquor at Darlington for the period of one year. That any possible injury to plaintiffs from the operation of a dispensary at Darlington by deponent would be light in comparison with the public inconvenience and loss that would ensue from the continuance of the injunction.

12. That subject to and without waiver of the objection hereinbefore stated to the jurisdiction of the court to entertain this action, and of the right of the court to go behind the appointment and permit of deponent, and to inquire into the error of fact committed by said county board of control in the exercise of its judgment and discretion, this deponent for further cause shows:

(*a*) That one of the plaintiffs, to wit: J. Witherspoon Evans, is not a freehold voter of the town of Darlington, residing at the time of the commencement of this action and now beyond the limits of the said town, and that he owns no real estate therein; and further, that C. S. McCullough, his coplaintiff, appears as a petitioner upon the petition of G. A. Bland for appointment as such dispenser, and that he is informed and believes that only a few of the freehold voters of the said town and county join in or favor this action.

(*b*) That he denies that the said act is in violation of and repugnant to the Constitution of the United States or the Constitution of the State of South Carolina, or to any parts thereof.

(*c*) He denies that exhibit B to the complaint is a copy of the paper filed by him in the office of the clerk of the court. The petition filed there is a true copy of his original petition, with the exception that it has an additional name placed there and not taken off, by mistake, and that the names of H. J. La-Motte and B. Block do not appear, deponent leaving them out because of finding out that they were not freehold voters.

(*d*) That he denies that the county board of control unlawfully appointed him county dispenser.

(*e*) That he denies that M. J. Libbey, one of the sureties on his bond as dispenser, is irresponsible, and that his bond is not such a bond as is required by the provisions of the said act. The said M. J. Libbey is a widow woman, with one child, who is a married woman, and is, as deponent is informed and believes, free of debt and the owner, besides of considerable personal property, of a lot and buildings in the town of Darlington, worth at least twenty-five hundred dollars; and the other surety on his said bond, to wit: T. A. Floyd, is deponent's mother, is free of debt, and is worth from fifteen to twenty thousand dollars. That said bond amply secures the State.

(*f*) That the 11th paragraph of plaintiffs' complaint, purporting to give a list of the freehold voters of the town of Darlington, is incorrect in the following particulars, to wit: [Here follows specifications as to individuals alleged in the complaint to be freeholders, to show that they were not, and some additional names alleged to be freeholders; and denials as to improper signatures.]

(*h*) That he denies that his said petition and the signatures thereto failed to comply with the requirements of the said act.

(*i*) That when deponent proceeded to obtain signatures to his petition, he was inexperienced in such matters, and never dreamed of his honor and integrity being impeached among people who had known him from his childhood up; and he now sees that he acted very thoughtlessly and imprudently,

but he declares that in all that he did he acted in perfectly good faith. There is not a single name on his petition that he did not believe at the time it was signed to be that of a freehold voter. He was careful that every person that signed in his presence should carefully understand what he was doing. They who could read well read it for themselves, and from necessity deponent read and explained it to those who could not read, or read writing imperfectly. The effort that has been made to induce ignorant and pliable colored men to dispute their signature has astonished deponent as much as it has offended him. [Duly verified.]

The answer of the members of the county board of control was the same as that of J. B. Floyd, *supra,* in its first eleven paragraphs. The last section of this answer was as follows:

That subject to, and without waiver of, the objection heretofore stated to the jurisdiction of the court, the deponents, for further cause, show: (*a*) That they deny that the said act is in violation of, and repugnant to, the Constitution of the State of South Carolina, or to any part thereof. They deny that as a board of control they unlawfully appointed the said John Buckner Floyd county dispenser; that his said bond is insufficient; that the petition of the said John Buckner Floyd and the signatures thereto failed to comply with the requirements of the said act; and that the opening and operation of a dispensary for the sale of intoxicating liquors in the town of Darlington by the said J. Buckner Floyd as county dispenser, by virtue of his said permit and the provision of the said act, will entail great damage to the citizens and freeholders of the town of Darlington. (*b*) They further deny all other allegations in said complaint contained, tending to show that the said J. Buckner Floyd was not duly, legally, and in compliance with the provisions and requirements of the said act, appointed county dispenser by deponents as the county board of control. (*c*) That after due public notice, deponents, as the county board of control, at a meeting held in their office at Darlington Court House, on the 17th day of June last past, proceeded to consider three applications that had been filed for the position of a

county dispenser; that a committee appointed by citizens of
the town of Darlington, one of plaintiffs being one of said com-
mittee, appeared before the said board, and submitted objection
to a number of names on each of the petitions filed, claiming
the same to be the names of persons who were not freehold
voters of the town, but made no protest against the board pro-
ceeding to the consideration of the matter; that the said board
carefully considered and investigated the said objection, and
further considered all the names upon each of the petitions,
and, after condemning a number of names on each petition,
adjudged by a majority vote and decision that the petition of
J. Buckner Floyd alone contained the requisite number of
signatures of *bona fide* freehold voters of said town, and there-
upon approved of his said application and appointed him county
dispenser for the county of Darlington; that thereafter, on the
22d day of June last past, the said J. Buckner Floyd having
complied with the requirements of the said act in respect to his
bond and oath of office, deponents, as said board, approved of
his said bond, and issued to him a permit as county dispenser,
one of their number, however, signing the permit subsequent
to said vote.   In all of said proceedings deponents acted in
entire good faith, exercising to the best of their ability their
judgment and discretion, and were animated alone by an anx-
ious desire to faithfully and efficiently discharge their duties as
members of the said county board of control.

The injunction was granted, and the defendants appealed.

The other five cases stated in the heading were indictments in
the usual form for selling intoxicating liquors in Columbia after
the first day of July, 1893.   These indictments were quashed
under demurrers and motions to quash, on the grounds that the
Dispensary Act was unconstitutional, and because it provided
no punishment for the offence charged.   The State appealed.

*The attorney general, Mr. Nelson,* solicitor, and *Messrs. Boyd
& Brown,* for appellants.

*Messrs. C. S. Nettles, C. A. Woods, Melton & Melton, J. P. K.
Bryan, Simons, Seigling & Cappellman, Mitchell & Smith,* and *J.
N. Nathans,* contra.

April 19, 1894.   The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   These cases all arise under an act, entitled "an act to prohibit the manufacture and sale of intoxicating liquors, as a beverage, within this State, except as herein provided," approved 24th of December, 1892 (21 Stat., 62), and were, therefore, heard and will be considered together; for while there are certain subordinate questions presented in some of the cases which do not arise in others, yet they all present the question of the constitutionality of the act.   To that question, as one of overshadowing importance, we propose first to direct our attention.  `Before doing so, however, it may be proper to state that, just before the commencement of the argument, the attorney general, deeming it due to the court so to do, presented a suggestion in writing, calling the attention of the court to the fact that, at the recent session of the General Assembly (1893) another act on the same subject had been passed, which might possibly be regarded as repealing or superceding the act of 1892, under which these cases arise; and if so, might deprive the questions presented in these cases of any practical character, leaving them only as speculative questions, which the court might not be willing to hear.   But as no motion to dismiss the appeals was made, and no application on the part of the counsel for the State to abandon the appeals upon any such grounds was presented, this court will not of its own motion decline to hear the cases; but, on the contrary, will assume, for the purpose of this discussion, that these cases are not in any way affected by the passage of the act of 1893, but do present practical questions which this court is bound to decide.

Recurring, then, to the question of the constitutionality of the act, it may be as well to say in the outset that we freely concede that the presumption is always in favor of the constitutionality of an act of the legislature; and hence, as is said by Shaw, C. J., *In re Wellington, petitioner*, 16 Pick, 95, referred to with approval by Judge Cooley in his great work on Constitutional Limitations, at page 182 of the second edition (which it may be as well to say here is the edition referred to throughout this opinion): "When courts are called

upon to pronounce the invalidity of an act of legislature passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." A reasonable doubt must be solved in favor of the legislative action, and the act be sustained. Or as was said by Marshall, C. J., in *Fletcher* v. *Peck*, 6 Cranch, 128, likewise quoted with approval by Judge Cooley in the same connection: "The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implications and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." These views have been fully recognized in this State, as is most fully, clearly, and forcibly set forth by Mr. Justice McGowan in *Ex parte Lynch*, 16 S. C., 32, and have been approved in many other cases.

We also freely concede that in considering the question whether an act of the General Assembly of this State is in conflict with the Constitution, either State or Federal, the inquiry is, whether there is anything in either of these instruments forbidding the passage of such an act, either in express terms or by necessary implications; whereas, in considering the question of the constitutionality of an act of Congress, the inquiry is, whether there is anything in the Federal Constitution which, either in express terms or by necessary implication, confers upon Congress the power to pass the act in question.

Fully impressed with these conceded principles we approach the consideration of the question whether the act of the 24th of

December, 1892, which, for convenience, will be designated throughout this discussion as the Dispensary Act, is in conflict with any constitutional provision, either State or Federal. In considering this question the first inquiry which naturally presents itself is, what is the general nature, scope, and objects of the act, as disclosed by its terms? Without going into a detailed consideration of the numerous sections of the act, we think it is safe to say that it is an act forbidding the manufacture or sale of intoxicating liquors as a beverage, within the limits of this State, by any private individual, and vesting the right to manufacture and sell such liquors in the State, exclusively, through certain designated officers and agents. (We may say here that in the further discussion of this subject we will drop the word "manufacture" and speak only of the sale, or keeping for sale, of intoxicating liquors as a beverage, not only for convenience of phraseology, but for the better reason, that in none of these cases which we are called upon to decide does the question of the manufacture of intoxicating liquors arise, but they all relate to the sale, or keeping for sale, of such liquors.)

It seems to us that the view which we have presented as to the nature, scope, and object of the act is manifest, not only from the title of the act, but also from the provisions found in almost every section. The title declares it to be an act to prohibit the sale of intoxicating liquors, "except as herein provided," and the various sections show, beyond dispute, that the only exception made is the State, which is expressly authorized to engage in the sale of intoxicating liquor for any purpose whatever, either as a beverage or otherwise. Indeed, the body of the act goes further than the title; for, while the language used in the title seems to indicate that the purpose of the act was only to forbid the sale of intoxicating liquors "as a beverage," yet in the body of the act it is very manifest that a sale of such liquors for any purpose, and not simply "as a beverage," is forbidden, except when made by the State through certain designated officers and agents. Licensed druggists must buy such intoxicating liquors as may be necessary in compounding their medicines and tinctures only from the

designated agents of the State. Even wine for sacramental purposes can only be bought from such agents.

In other words, the manifest object of the act is, that the State shall monopolize the entire traffic in intoxicating liquors, to the entire exclusion of all persons whomsoever; and this, too, for the purpose of profit to the State and its governmental agencies, counties, and municipal corporations; for the act, after appropriating the sum of $50,000 from the state treasury for the purpose of purchasing a supply of liquors with which to begin the business, provides that the liquors so purchased by the state commissioner shall be sold by him to the various county dispensers, at a profit not exceeding fifty per centum of the net cost thereof, and that the proceeds of such sales shall be paid into the state treasury, upon which the commissioner may draw from time to time, the amounts necessary to meet the expenses incurred in conducting the business; and also provides that the county dispensers may sell such liquors to consumers at a profit not exceeding fifty per centum above the cost thereof, except in sales to licensed druggists, where the profit is limited to ten per centum, and that all profits, after paying the expenses of such dispensary, shall be divided equally between the county and the municipal corporation within which such dispensary is located. It is also provided that the state commissioner may sell intoxicating liquors so purchased by him, to persons outside of the State.

This being the nature, scope, and object of the Dispensary Act, our next inquiry is, whether it conflicts with any provision of our State Constitution? There are at least two of the provisions of that instrument with which the Dispensary Act conflicts. The first section of the first article of the Constitution reads as follows: "All men are born free and equal, endowed by their Creator with certain inalienable rights, among which are the rights of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness." And in section fourteen of the same article, it is explicitly declared that: "No person shall be * * * despoiled or dispossessed of his property, immunities, or privileges * * *

or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land." Here, then, we have not only an explicit declaration that every person in this common-wealth has certain rights derived—not from the government—but from the Creator, which are declared to be inalienable, but also an express declaration that he shall not be deprived of them except in one of two ways—first, by the judgment of his peers, or, second, by the law of the land. So sacred was this right of property regarded that the framers of the Constitution, not content with the general provisions above referred to, de-claring the right and forbidding any interference with such right, proceeded, in the twelfth section of the first article, to declare explicitly that, "No person shall be * * * prevented from acquiring, holding, and transmitting property."

Now, then, what are these inalienable rights of personal liberty and private property thus emphatically asserted and carefully guarded, and what do they necessarily involve? As it is said by Earl, J., in *In re Jacobs*, 98 N. Y., 98, reported, also, in 50 Am. Rep., 636: "The constitutional guaranty, that no person shall be deprived of his property without due process of law, may be violated without the physical taking of property for public or private use. Property may be destroyed, or its value may be annihilated; it is owned and kept for some useful purpose, and it has no value unless it can be used. Its capa-bility for enjoyment and adaptability to some use are essential characteristics and attributes, without which such property cannot be conceived; and hence any law which destroys it or its value, or takes away any of its essential attributes, deprives the owner of his property. The constitutional guaranty would be of little worth if the legislature could, without compensation, destroy property or its value, deprive the owner of its use, deny him the right to live in his own house, or to work at any lawful trade therein." Blackstone, in 1 Comm., 138, says: "The third absolute right inherent in every Englishman is that of property; which consists in the free use, enjoyment, and dis-posal of all his acquisitions, without any control or diminution save only by the laws of the land." To same effect, see what is said by Miller, J., in *Pumpelly* v. *Green Bay Co.*, 13 Wall, at

pp. 177–8; also, what is said by Comstock, J., in *Wynehamer* v. *People*, 13 N. Y., 398, and, also, by Andrews, C. J., in *People* v. *Otis*, 90 N. Y., 48. See, also, what is said by the same judge in *Bertholf* v. *O' Reilly*, 30 Am. Rep., at p. 328 (74 N. Y., 509).

Again, it is said in the case of *In re Jacobs, supra:* "So, too, one may be deprived of his liberty, and his constitutional rights thereto violated, without the actual imprisonment or restraint of his person. Liberty, in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or vocation." See, also, to the same effect, what is said by Mr. Justice Field in his concurring opinion of *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S., at pp. 756–7, and what is said by Mr. Justice Bradley in his concurring opinion in the same case, in which he was joined by Mr. Justice Harlan and Mr. Justice Woods, p. 764, and as was said in *Livestock etc. Association* v. *Crescent City etc.*, 1 Abb. (U. S.), 388, 398: "There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

If, then, it can be shown that the traffic in intoxicating liquors is not in itself unlawful, but, on the contrary, that intoxicating liquor is a lawful subject of commerce, then it follows, from what has been said, that the Dispensary Act, in so far as it undertakes to forbid every person in this State from engaging in such traffic, conflicts with the above mentioned constitutional provisions, and is, therefore, null and void, unless such legislation can be defended as an exercise of what is known as the police power—a question which will be hereinafter considered. We do not see how it can be denied that such a traffic is lawful. Judge Cooley, in his work on Cons. Lim., at pp. 583–4, says in express terms that it is lawful, and every one of the numerous cases decided by the Supreme Court of the United States, involving questions whether State legislation, designed to prohibit the sale of intoxicating liquors, are affected by the interstate

commerce clause of the Constitution of the United States, neces-
sarily imply that intoxicating liquor is a subject of lawful
commerce. For, otherwise, such questions could not arise. It
was only upon this ground that the decision in the case of *Leisy*
v. *Hardin*, 135 U. S., 100, was, or could be, defended. There
the question was whether such liquors imported into the State
of Iowa from the State of Illinois could be lawfully sold in the
unbroken packages in which they were imported within the
limits of the State of Iowa, and the court held, that notwith-
standing the stringent provisions of the Iowa prohibitory law,
such liquors could be sold by the importer as long as the orig-
inal package remained in his hands unbroken; and that the
Iowa statute, in so far as it purported to forbid such a sale,
was in conflict with that clause of the U. S. Constitution con-
ferring upon Congress the power to regulate commerce with
foreign States and between the several States.

In that case Fuller, C. J., in delivering the opinion of the
court, cites with approval certain language used by Mr. Justice
Matthews, in delivering the opinion of the court in the case of
*Bowman* v. *Chicago &c. Railway Company*, 125 U. S., 465, in-
volving the same principle, where he draws a distinction between
articles not in a merchantable condition, and, therefore, not
legitimate subjects of commerce—for example, rags likely to
spread infectious diseases, and other articles which are legiti-
mate subjects of commerce, amongst which intoxicating liquors
must have been classed, or the decision could not possibly have
been what it was. Even in the case of *In re Rahrer*, 140 U. S.,
at p. 556, Fuller, C. J., recognizes the same doctrine, although
that case arose after the passage of what is commonly known
as the "Wilson bill," which was doubtless passed with a view
to obviate the effect of the decision in *Leisy* v. *Hardin*, *supra*.

Indeed, the whole course of legislation, both State and Fede-
ral, demonstrates that the sale of intoxicating liquors is a legi-
timate subject of commerce and trade, for otherwise it would
be absolutely impossible to vindicate the United States Internal
Revenue law, and the very numerous statutes which have been
passed in this State ever since the foundation of the government,
permitting the sale of intoxicating liquors, under such regula-

tions as the law-making power may have from time to time deemed necessary, either to secure a revenue from such traffic or to surround it with such restrictions as have been thought necessary or expedient to prevent evils apt to grow out of such traffic. To say, therefore, that the sale of intoxicating liquors belongs to that class of wrongs denominated as *mala in se,* would be to cast a grave imputation upon the law-making department of the government, both State and Federal, and this we are very'far from being willing to do. Indeed, the very highest of all authority might be cited to show that the manufacture and sale of spirituous liquors is not *malum in se.* Indeed, the most ardent prohibitionists, so far as their wishes have taken the shape of law, must be regarded as admitting the proposition for which we contend; for every prohibition law which has fallen under our notice contains provisions recognizing this proposition by excepting from its operation sales of liquors for certain purposes, viz: medical, scientific, mechanical or sacramental purposes, thereby expressly admitting that the mere sale of intoxicating liquors is not only not wrong, but actually necessarily or useful for certain purposes. The very act now under consideration—the dispensary law—by its express terms, shows, beyond all dispute, that the General Assembly did not intend to'put its seal of condemnation upon the sale of intoxicating liquors, as morally wrong, or even as subversive of the public welfare, for it makes ample provisions for the sale of such liquors to an unlimited extent for any purpose whatsoever, and makes specific provision for the sale of liquor in just such quantities as would suit all classes of consumers.

Before, therefore, the sale of intoxicating liquors can be declared unlawful, there must be some valid statute declaring it to be so; and, we must say, that we have been unable to find any such statute on the statute books of this State. Of course, we can find many statutes forbidding such sale except upon certain prescribed conditions, but none making the sale absolutely unlawful, unless it be in certain specified localities, under what are called "local option laws," which are exceptional in their character, and need not be considered here. While, therefore, without permitting ourselves to indulge in

any sentimental declamation as to the evils flowing from an unregulated and unrestricted traffic in intoxicating liquors, which, however appropriate elsewhere, we do not regard as becoming in a judicial opinion, we freely admit all that can properly be said on the subject, and, therefore, we fully concede the power on the part of the legislature to throw around such traffic all safeguards necessary and proper to prevent, or at least minimize, such evils; and while we may further admit, for the purposes of this discussion, that the legislature may go further, and absolutely prohibit the sale of intoxicating liquors within the limits of this State, yet the practical question still remains, whether the Dispensary Act falls within either of these classes.

It does not seem to us possible to regard the Dispensary Act as a law prohibiting the sale of intoxicating liquors. On the contrary, it not only permits but absolutely encourages such sale to an unlimited extent; for by its profit features it holds out an inducement to every taxpayer to encourage as large sales as possible, and thereby lessen the burden of taxation to the extent of the profits realized. If the act, instead of confining the privilege of selling liquor to the State, had undertaken to confer such exclusive privilege upon one or more individuals, or upon a particular corporation, could there be any doubt that such an exercise of legislative power would be unconstitutional? We can see no difference in principle between the two cases. Even the *Slaughter House Cases*, as they are called (16 Wall, 36), decided by a bare majority of the court, and which must be regarded as having gone to the extreme limit, did not go to the extent of holding that an act forbidding all other persons except the favored corporation from pursuing the lawful occupation of a butcher, or from carrying on any other lawful business or trade, would be constitutional, for the opinion of the majority of the court was rested expressly upon the ground that the act there in question *did not forbid* any person who might desire to do so from pursuing the avocation of a butcher, but only required him, as a measure of police regulation, to have his slaughtering done at a specified place, upon paying reasonable charges prescribed by the act to

16—41

the corporation for the use of the conveniences for that purpose, which said corporation was bound under a heavy penalty to furnish any one who desired to use them. It is very obvious, therefore, that the act there under consideration differed very widely from the act which we are now called upon to consider.

If, then, the Dispensary Act cannot be defended as a prohibitory law, it is contended that it may be sustained as a law regulating the sale of intoxicating liquors under which is called the police power, which, it is claimed, practically is unlimited in its scope by constitutional provisions, and its exercise depends solely upon the legislative will, which cannot be controlled or restricted by the judiciary. It seems to us that such a claim is not only utterly at variance with any just conception of a constitutional government, but is entirely inconsistent with the numerous cases in which the courts, both State and Federal, have undertaken to limit and restrict the exercise of such a power by State legislation; and, what is more to the point in this particular case, our own court has distinctly repudiated the idea that the exercise of what is claimed to be the police power is beyond judicial control. In the case of *McCandless* v. *Richmond & Danville R. R. Company*, 38 S. C., 103, Mr. Justice Pope, as the organ of the court, after referring to the fact that the Circuit Judge had held that the statute there in question was a valid exercise of the police power, uses this language: "But a careful consideration of the latest official declaration of this law by the Supreme Court of the United States has led us to modify our conceptions of what is involved in what is called the police power of a State in this Union of States. The fundamental idea in ascribing such potency to this principle of the law is based upon the immutable principle of self-defence." And upon this point of the case the court was unanimous, though there was a dissent upon another point.

Indeed, to hold that every act of the General Assembly passed under the guise of an exercise of the police power, or sought to be defended upon that ground, is beyond judicial control, would render every guaranty of personal right found in the Constitution of little or no value. See, also, what is said by

Mr. Justice Harlan, in the case of *Mugler* v. *Kansas*, 123 U. S., at p. 661, where, after recognizing the existence of, and the necessity for, the police power, and after admitting that such power belongs to the legislative department of the government, uses this language: "It belongs to that department to exert what are known as the police powers of the State, and to determine primarily what measures are appropriate or needful for the protection of the public morals, the public health or the public safety. It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are of necessity limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (*Sinking Fund Cases*, 99 U. S., 700), the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in *Marbury* v. *Madison*, 1 Cranch, 137, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?' * * * *The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the legislature had transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety has no real or substantial relations to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.*" (Italics ours.) See, also, what was said by our own court in the case of *Whaley* v. *Gaillard*, 21 S. C., at p. 578, where the same principle was applied to a totally different subject—the limitation of the power of the legislature to contract a public debt.

It seems to us, therefore, that it is not only our right, but our duty, to inquire whether the Dispensary Act was intended to be an exercise of the police power to regulate the sale

of intoxicating liquors, and if so, whether its terms have any real or substantial relation to that object. Now it is quite certain that the act does not, *in terms*, purport to be an act to *regulate* the sale of. intoxicating liquors by persons who may be engaged, or who may desire to engage, in such traffic. On the contrary, its declared purpose is to absolutely prohibit such sale by private individuals, and this is made more manifest by the numerous provisions found in the body of the act. Now, while the power of the legislature to enact such laws as may be deemed necessary and proper to regulate the sale of intoxicating liquors by any person within the limits of the State, in order to prevent or, at least, reduce, as far as possible, the evils which are apt to flow from such a traffic, is conceded, yet we can not regard the dispensary law as such an act. Indeed, it must be a contradiction in terms to speak of an act of such a character as this is, as an act to *regulate* the sale of liquor by the people of the State; for it is difficult to see how an act forbidding a sale can be regarded as an act regulating such sale. That which is forbidden cannot well be regulated.

But it may be said that the Dispensary Act, while forbidding all private persons to sell intoxicating liquors, does permit such sale to be made by the State itself, through its authorized officers and agents, and that these sales may be and are regulated by the numerous provisions of the Dispensary Act. But when it is remembered that all restrictions upon, or regulations of, sales of any lawful article of commerce can be vindicated only as an exercise of the police power, we do not see how such a view can be accepted. The police power, however, can only be resorted to for the government and control of the people of the State, and cannot, with any propriety, be appealed to for the purpose of controling the action of the State itself; and, as the State can only act through its authorized officers or agents, the police power cannot be resorted to for the purpose of controling such officers and agents, if for no other reason, because it is wholly unnecessary, as the State has ample means of controling its own officials without resorting to the undefined and, therefore, dangerous power, known as the police power.

But even if this view be not sound, and this provision of the Dispensary Act, whereby the State assumes to itself the exclusive right to engage in the sale of intoxicating liquors, taking to itself and its subordinate governmental agencies the entire profits of such a traffic, to the utter exclusion of all private individuals, could, with any propriety, be regarded as a police regulation for the protection of the public health or public morals, there would still remain the question, whether such an exercise of the police power was necessary to effect these important purposes; for after all the exertion of the police power, especially where it abridges or destroys the constitutional rights of the citizen, can only be vindicated as a measure of self-defence, as it is expressed by Mr. Justice Pope, *supra*, or, as is expressed by other authorities, by some overruling necessity. If the various restrictions and regulations as to the sale of intoxicating liquors by the officers and agents of the State be designed only for the protection of the public health or the public morals, and are fit and appropriate to that end, we do not see why such restrictions and regulations could not be applied to the sale of such intoxicating liquors by private individuals; and if so, then certainly there was no necessity for any such sweeping act, whereby the constitutional rights of the citizen, hereinbefore referred to, have been absolutely destroyed, but these rights would be reserved to the citizen, and only restricted by such regulations as may be necessary for the public good.

But in addition to this, we are compelled to say, without in the slightest degree intending to impeach the motives or to criticise the intentions of the members of the legislature, by which this act was passed, and, on the contrary, freely according to them the best motives and the purest intentions, that judging the act from the terms employed in it (the only way in which a court is at liberty to form an opinion), it cannot be justly regarded as a police regulation, but simply as an act to increase the revenue of the State and its subordinate governmental agencies. This is apparent from the profit features of the act, from the various stringent provisions designed to compel consumers of intoxicating liquors to obtain them only

from the officers and agents of the State, and notably by the provision authorizing the State commissioner to sell such liquors to persons outside of the limits of the State, which certainly cannot be regarded as bearing the faintest resemblance to a police regulation for the purpose of protecting the public health or the public morals of the people of this State.

But it is earnestly contended by the attorney general, that if the power to prohibit absolutely the sale of intoxicating liquors be conceded, it follows, necessarily, that the State may assume the monopoly of such a trade, and in support of this view he cites Tiedeman on the Limitations of the Police Power, 318, where that author uses the following language: "There is no doubt that a trade or occupation which is inherently and necessarily injurious to society may be prohibited altogether; and it does not seem to be questioned that the prosecution of such a business may be assumed by the government and managed by it as a monopoly." But the only authority which the author cites to sustain this rather extraordinary proposition is the case of *State* v. *Brennan's Liquors*, 25 Conn., 278, overlooking entirely the case of *Beebe* v. *State*, 6 Ind., 501, which holds an opposite view, and which had been previously cited by the same author at p. 197, and quoted from apparently with approval. But in addition to this, we are unable to perceive how the right to prohibit a given traffic carries with it the power in the State to assume the monopoly of such traffic. If the right to prohibit the sale of intoxicating liquors rests upon the ground that such a traffic "is inherently and necessarily injurious to society," as is involved in the statement by the author of his proposition, then it seems to us that the logical and necessary consequence would be, that the State could not engage in such traffic, for otherwise we should be compelled to admit the absurd proposition that a State government, established for the very purpose of protecting society, could lawfully engage in a business which "is inherently and necessarily injurious to society." We must prefer, then, to follow the case of *Beebe* v. *State* rather than *State* v. *Brennan's Liquors;* for while it has been said that the case of *Beebe* v. *State* has been overruled (though the case to that effect has not been brought

to our attention), yet we do not cite the case as authority, for it is not authority here, but it is only referred to for the reasoning contained in the opinion. Indeed, neither the Indiana nor the Connecticut case could constitute authority in this case, for the reason that the statute which we are called upon to construe contains very different provisions from those found either in the Indiana or Connecticut statutes.

But in this connection we are enabled to cite a very recent case which the research of counsel for respondents has furnished us with, which, it seems to us, is as conclusive of this whole matter as any case from abroad can be. That is the case of *Rippe* v. *Becker*, 57 N.W. Rep., 331, in which one of the points distinctly decided is thus stated in the syllabus *prepared by the court:* "The police power of the State to regulate a business is to be exercised by the adoption of rules and regulations as to the manner in which it shall be conducted by others, and not by itself engaging in it." In that case the question was as to the constitutionality of an act entitled "An act to provide for the purchase of a site, and for the erection of a State elevator or warehouse at Duluth for public storage of grain," and one of the grounds upon which it was sought to sustain the constitutionality of the act was that it was an exercise of the police power. But the court held, that while "the right of the State, in the exercise of its police power, to regulate the business of receiving, weighing, inspecting, and storing grain in elevators and warehouses as being a business affected with a public interest, is now settled beyond all controversy" by the case of *Munn* v. *Illinois*, 94 U. S., 113, and others on the same line, yet that the act there in question could not be regarded as a police regulation of the business, and that the police power of the State to regulate a business does not include the power to engage in carrying it on. It would extend this opinion to an unwarrantable length to make further quotations from the opinion of the court in that case, which might be instructive and profitable.

It seems to us, therefore, that in no view of the case can the Dispensary Act be regarded as a police regulation of the business of selling intoxicating liquors, and even if it could

be, that such police power does not include the power on the part of the State to engage in carrying on such business.

Finally, the constitutionality of the Dispensary Act is assailed upon the ground that the legislature have undertaken thereby to embark the State in a trading enterprise, which they have no constitutional authority to do—not because there is any *express* prohibition to that effect in the Constitution, but because it is utterly at variance with the very idea of civil government, the establishment of which was the expressly declared purpose for which the people adopted their Constitution; and, therefore, all the powers conferred by that instrument upon the various departments of the government must necessarily be regarded as limited by that declared purpose. Hence, when, by the first section of the second article of the Constitution, the legislative power was conferred upon the General Assembly, the language there used cannot be construed as conferring upon the General Assembly the unlimited power of legislating upon any subject, or for any purpose, according to its unrestricted will, but must be construed as limited to such legislation as may be necessary or appropriate to the real and only purpose for which the Constitution was adopted, to wit: the formation of a civil government. In this connection, it is noticeable that the word *"all"* is not used in the section above referred to, but the language used is, "the legislative power," meaning such legislative power as may be necessary or appropriate to the declared purpose of the people in framing their Constitution and conferring their powers upon the various departments constituted for the sole purpose of carrying into effect their declared purpose.

It is manifest from the numerous expressed restrictions upon the legislative will found in the Constitution that the people were not willing to entrust even their own representatives with unlimited legislative power; but, as if not satisfied with these numerous express restrictions, and perhaps fearing that some important right might have been overlooked, a general clause, not usually found in State Constitutions, was inserted, apparently designed to cover any such omissions; for in section 41

of article 1 it is expressly declared that "the enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people." Now, upon well settled principles of constitutional construction, we are not at liberty to disregard this clause, but must give it some meaning and effect. It seems to us that the true construction of this clause is that while there are many rights which are expressly reserved to the people, with which the legislature are forbidden to interfere, there are other rights reserved to the people, not expressly but by necessary implication, which are beyond the reach of the legislative power, unless such power has been expressly delegated to the legislative department of the government. These views have not only the support of the highest authority in this country, as may be seen by reference to the cases of *Loan Association* v. *Topeka*, 20 Wall, 655, and *Parkersburg* v. *Brown*, 106 U. S., 487, but have been distinctly adopted by the Supreme Court of the State in *Feldman* v. *City Council*, 23 S. C., 57, as well as by the courts of Massachusetts and Maine, as may be seen by reference to *Allen* v. *Joy* (60 Me., 124, 11 Am. Rep., 185), and *Lowell* v. *City of Boston* (111 Mass., 454, 15 Am. Rep., 45); and what is more, they were applied to the vital power of taxation—a power absolutely essential to the very existence of every government. These cases substantially hold that, although there may be no express restriction contained in a State Constitution forbidding the imposition of taxes for any other purpose than a public purpose, yet such a restriction must necessarily be implied from the very nature of civil government, and hence the legislative department under the general power of taxation conferred upon it cannot impose any tax except for some public purpose.

Upon the same principle it seems to us clear that any act of the legislature which is designed to or has the effect of embarking the State in any trade which involves the purchase and sale of any article of commerce for profit, is outside and altogether beyond the legislative power conferred upon the General Assembly by the Constitution, even though there may be no express provision in the Constitution forbidding such an exer-

cise of legislative power. Trade is not and cannot properly be regarded as one of the functions of government. On the contrary, its function is to protect the citizen in the exercise of any lawful employment, the right to which is guaranteed to the citizen by the terms of the Constitution, and certainly has never been delegated to any department of the government.

We do not deem it necessary to go into any extended consideration of the fearful consequences of recognizing the power of the legislature to embark the State in any trade arising from the hazards of all business of that character, or to comment upon the danger to the people of the monopoly of any trade by the State; for if it can monopolize one, it may monopolize any or all other trades or employments, although it is permissible for a court when called upon to construe an act, to consider its effects and consequences. For it may be said—indeed, has been said—that the good sense and patriotism of the members of the General Assembly may be safely relied upon to protect the people from such apprehended dangers. But that great luminary of the law, Chief Justice Marshall, did not seem to think that this was a sufficient protection, as may be seen by what he said in *McCulloch* v. *Maryland*, 4 Wheat., 316, and in *Brown* v. *Maryland*, 12 Wheat., 419. Nor did the Supreme Court of the United States in later days seem to think that this confidence in the good sense and patriotism of the legislative department was a sufficient safeguard against the exercise of a power which might become dangerous; for while, on the one hand, in the case of *Dobbins* v. *Commissioners of Erie County*, 16 Peters, 435, it was held that a State cannot tax the salary of a United States officer, on the other hand, in the case of *Collector* v. *Day*, 11 Wall, 113, it was held that the United States could not tax the salary of a State officer; although in the case last cited, in his dissenting opinion, Mr. Justice Bradley took the ground that such confidence would be a sufficient safeguard against a dangerous exercise of the taxing power.

These two cases were decided upon the principle that, inasmuch as "the power to tax involved the power to destroy," as had been said by Marshall, C. J., in *McCulloch* v. *Maryland, supra*, the only adequate protection was to deny the power of the State

government to tax the means and instrumentalities employed by the United States government to carry into operation the powers granted to it; and for a like reason the power of the United States government is denied to tax the means and instrumentalities employed by the State government to carry into effect its powers, although both of these governments were established for the protection and preservation of the rights of the same people; and this was held, although there is no express provision in either of the Constitutions of these two governments forbidding the imposition of such a tax. For, as was said by Mr. Justice Nelson, in delivering the opinion of the court in the case last cited, "It is admitted that there is no express provision in the Constitution that prohibits the general government from taxing the means and instrumentalities of the States, nor is there any prohibiting the States from taxing the means and instrumentalities of that government. In both cases the exemption rests upon necessary implication, and is upheld by the great law of self-preservation."

It is urged, however, that in the past the State engaged in the business of banking, and in the establishment of a State college, and these furnish a precedent for the State engaging in any other business which may be deemed by the legislative department of the government conducive to the public welfare. In the first place, these institutions were established under the Constitution of 1790, which contain no such provision as that found in the forty-first section of the first article of the Constitution of 1868. In the second place, we are not informed of any instance in which the constitutionality of the acts establishing either of those institutions was ever brought to the test of judicial decision, and, therefore, they can form no precedent for our guidance in this case. In the third place, the establishment of a bank may be, and has been, most ably defended upon the ground that such an institution is necessary to the proper control and management of the fiscal affairs of the government, and is, therefore, a proper governmental instrumentality; though we must not be understood as endorsing the proposition thus ably defended, for that question is not now before us, and we do not propose now to intimate

any opinion upon the subject. As to the college, we do not regard that institution, in any proper sense of the term, as a *business*, certainly not as a trade, and bears no analogy whatever to the business of buying and selling intoxicating liquors, or any other article of commerce. And as to the business of school teaching, if such an occupation can be characterized as a business, in the sense in which that term is used in this opinion, the very fact that the framers of the present Constitution saw fit to incorporate in the present Constitution an express mandate, requiring the establishment of public schools, is not only destructive of any argument drawn from analogy as to the power of the State to engage in any business, but also warrants the inference that without such express mandate the State would not have the power to engage in such so-called business.

Finally, it seems to us that the question as to the right of the State to engage in any trade or business for the purpose of gain has been practically determined adversely to such right in the recent case of *Mauldin* v. *Greenville*, 33 S. C., 1. There one of the questions raised was as to the power of the city council to purchase and hold an electric light plant for the purpose of lighting the streets and public buildings and offices of the city, and also for the purpose of furnishing lights to the people at proper charges therefor. The court held, that while the city council was invested with power to provide for lighting the streets and public buildings in the mode proposed, yet they had no power to engage in the business of furnishing lights to private individuals in their residences or places of business, for the reason, as it was pointedly expressed by Mr. Justice McGowan in delivering the opinion of the court: "As we understand it, all the powers given to the city council were for the sole and exclusive purpose of government, and not to enter into private business of any kind outside of the scope of the city government." And this was said, although the charter of the city—its constitution, so to speak—conferred upon the city council the broadest and most extensive powers for the good government of the city. So here we may say that the legislative power conferred upon the General Assembly by the Constitution of the State was given to them "for the sole and

exclusive purpose of government, and not to enter into private business of any kind outside of the scope of the (State) government."

Although the counsel for appellant very properly did not rely upon the case of the *State ex rel. Hoover* v. *Town Council of Chester*, 39 S. C., 307, as any authority whatever upon the questions presented in the present case, yet it may not be amiss for us to say that the questions here presented were not there decided or considered, for the very obvious reason that they were not necessary to the decision of that case, and, therefore, [fell] under the well settled rule (Cooley on Cons. Lim., 163), that a court will not, and ought not to, pass upon a constitutional question, and declare a statute to be invalid unless a decision upon that very point becomes necessary to the determination of the cause. Hence, in the Chester case, the court did not feel at liberty to consider the general question of the constitutionality of the Dispensary Act, and, on the contrary, carefully guarded against even any intimation of opinion as to the general question. Now, however, the question is squarely presented, and has been most fully and ably argued on both sides, and we are compelled to meet it. After the fullest and most careful and deliberate consideration, we feel constrained to say that the act is clearly unconstitutional, except in so far as it forbids the granting of licenses to retail spirituous liquors beyond the 30th of June, 1893. Under this view, all subordinate questions presented in all the cases, except the first named, lose all practical importance, and need not, therefore, be considered.

In the case first mentioned in the title of this opinion, however, there are other questions presented, some of which it is necessary to decide, although the necessity for the consideration of others is superseded by the conclusion which we have reached on the main question of the constitutionality of the Dispensary Act. It may be stated in general terms, that this was an action instituted by certain taxpayers of the county of Darlington, in behalf of themselves and other taxpayers of said county, who are too numerous to be made parties, for the purpose of enjoining and restraining the defendants from establishing a dispensary in the town of Darlington

upon several grounds, mainly upon the ground that the act
providing for such establishment is unconstitutional, null and
void. It will be well, however, for a full understanding of this
branch of the case that the pleadings in the case, without the
accompanying affidavits, should be incorporated in the report
of the case. Without considering at any length this question
of mere procedure, it seems to us that the remedy by injunction
is appropriate in the case as presented by the pleadings. The
real object of the action is to prevent certain persons from
engaging in a business involving the use of public funds de-
rived from taxation under an act of the legislature claimed to
be unconstitutional; and we think the authorities cited by the
counsel of record for the plaintiffs, especially Cooley on Taxa-
tion, 764, and 1 Pom. on Eq. Jur., 277, together with our own
case of *Mauldin* v. *Greenville, supra,* are amply sufficient to sus-
tain the view taken by the Circuit Judge. All the other ex-
ceptions in this case present questions which, in our judgment,
it becomes unnecessary to consider under the view which we
have taken as to the unconstitutionality of the act.

The judgment of this court is, that the judgments and orders
appealed from in each of the cases mentioned in the title be
affirmed.

Mr. Justice Pope, *dissenting.* These six cases were sepa-
rately tried on circuit, though differing in some particulars.
Inasmuch, however, as each one involved constitutional ques-
tions of similar import, were heard together in this court by
common consent, and under an order duly passed here for that
purpose.

The first case—that of McCullough *et al.* against Brown,
*et al.*—involves this point, which is not contained in the ques-
tion raised by the other five questions, viz: whether, in an
action on the equity side of the Court of Common Pleas, an in-
junction can issue to restrain a special tribunal, created by law
for a well defined purpose, from the performance of the duties
confided to its discretion, while acting within its jurisdiction.
We are of opinion that such a remedy cannot avail the plain-
tiffs. The only way the errors of such a tribunal, while acting

within its special jurisdiction, can be corrected, is under the writ of *certiorari*. This point has recently been considered and decided by this court in the case of *State ex rel. Gibbes* v. *Kirkland, ante,* 29.

The next five cases differ from the first cases—McCullough *et al.* against Brown *et al.*—in this: these being indictments against the respective defendants in the Court of General Sessions for a violation of what is known as the Dispensary Act, in the sale of beer against the provisions of that statute, the defendants demurred, because such act creating the offence provided no punishment therefor. And it was claimed that section 2653 of the General Statutes, which provides that in case of a conviction where no punishment is provided by statute, the court shall award such sentence as is conformable to the common usage and practice in this State, according to the nature of the offence, and not repugnant to the Constitution, the selling of liquors without a license is made a misdemeanor, and the punishment affixed to misdemeanors should have been applied. This ruling of the Circuit Judge was erroneous. Besides, it is far from being clear that section 21 of the Dispensary Act does not apply to the offence charged in the indictment. Section 21 is complete, in defining the offence and providing a punishment in express terms.

Thus the way is cleared, and it becomes necessary to consider the constitutional questions raised in these cases, they being the same in each of the six cases. The majority of this court has reached the conclusion that the whole act is unconstitutional. I am unable to agree with the other members of the court in such conclusion, and I propose to state my reasons for holding just the opposite views to those expressed by them.

Now this is a court. Therefore, the expression of any opinion on the merits of prohibition or anti-prohibition, license or no license, is no part of my business. The justice or injustice of an act of the legislature, its wisdom or improvidence, belong exclusively to the legislature and the people whose servants they are. If a law is unwise or improvident, let an appeal be made to the ballot box. This court nor any other court has any right under the Constitution to meddle with the legislature

in regard to foregoing matters.   I make these remarks because
it is very palpable that, in effect, such interference is sometimes
made, and there is a growing tendency on the part of the courts
to assume a power which the law has never given them, under
the guise of some philosophical abstraction that there is some
power in them by reason of some mysterious something called,
for the want of a better name, "the social compact."   This
country has been made to drink the cup of sorrow to its bottom
by reason of abstractions, and it is fully time that the good sense
of judges shall stamp such vague and shadowy claim, having as
its basis nothing in the organic law to support it out of exist-
ence; and if they do not, or will not, it is very sure that they
are leading the way to incalculable mischief, for the mutterings
of a coming storm by reason thereof are plainly distinct.   "An
ounce of prevention is worth a pound of cure."

The opinion of the majority is very explicit in its admissions
that all the presumptions are in favor of the constitutionality of
an act of the General Assembly, and that it is the duty of any
one assailing such an act as unconstitutional, to point out by
specific objections wherein it is unconstitutional.   In the cases at
bar we have more than presumptions as to its constitutionality,
for this court, in the case of *State ex rel. Hoover* v. *Town Council
of Chester*, 39 S. C., 307, have, among other things, held that
the Dispensary Act was duly passed by the General Assembly
and approved by the governor, so far as a compliance with the
constitutional requirements relating to and governing the mode
of enacting laws by the legislature are concerned.

The respondents in the court below recognized this duty to
specify the constitutional defects in this law, and have sought
to comply with it by assailing the power of the General Assem-
bly to enact such a law by reason of certain sections of the State
Constitution restricting the legislative power, or by necessary
implication denying its exercise.   I trust I fully recognize the
gravity of the suggested difficulties.   To enable me to discharge
my duty in their consideration, I have endeavored to realize
my solemn oath of office to uphold, protect, and defend the
Constitutions of the United States and of this State, and for
this purpose to close my ears to popular clamor, or the expres-

sions of opinion by others than members of this court, after the arguments of counsel had been heard. It will be a sad day for constitutional liberty in this State or country when cases are to be decided here with haste and without a thorough consideration by the members of this court, or when a decision here reached is the result, not of an investigation of legal and constitutional principles, but of partisan influences or dictation. A moment's reflection will establish it as a truth, that a judge who is made to vary his honest convictions of the law by a popular demand for such variance, is to be pitied as well as condemned. He is not justly entitled to be ranked with O'Neall, Johnston, Wardlaw, and others.

Let me now direct my attention to the points here raised, which, in my judgment, may be considered in the form of the following questions: 1st. What is the legislative power of this State, as defined in the Constitution, our own decisions, those of the Supreme Court of the United States, those of other States of this Union and by text writers of acknowledged authority? 2d. What restrictions are placed by the sections of our Constitution relied upon here fixing limits to the exercise of legislative power? 3d. To what class of legislation do restrictions refer, or the denial of the right to sell intoxicating liquors belong? And herein a brief sketch of our legislative history touching the traffic in intoxicating liquors as a beverage. 4th. Is the exercise of the police power attempted under the provisions of this act inhibited by the sections of the Constitution, either in their terms or by necessary implication from the terms actually used?

The preamble of our Constitution declares: "We, the people of the State of South Carolina, in convention assembled, grateful to Almighty God for this opportunity deliberately and peaceably of entering into an explicit and solemn compact with each other, and forming a new Constitution of civil government for ourselves and posterity, recognizing the necessity of the protection of the people in all that pertains to their freedom, safety, and tranquility, and imploring the direction of the great Legislator of the Universe, do agree upon, ordain, and establish the following declaration of rights and form of

17—41

government, as the Constitution of the commonwealth of South
Carolina." In the 26th section of the declaration of rights it
is provided: "In the government of this commonwealth, the
legislative, executive, and judicial powers of the government
shall be forever separate and distinct from each other, and no
person exercising the functions of one of said departments
shall assume or discharge any other." Section 27. "The Gen-
eral Assembly ought frequently to assemble for the redress of
grievances, and for making new laws as the common good may
require."

I will not transcribe the other sections in this declaration of
rights, but will content myself with giving the effect of other
sections thereof bearing on the General Assembly. Section 4
prevents any legislation looking to a dissolution of the Ameri-
can Union. Section 6 provides that no law shall be passed to
prevent the people from peaceably assembling to consult for
the public good and petition any department of the govern-
ment. Section 7 prohibits the enactment of any laws to
abridge the liberty of speech or of the press. Section 9 pro-
hibits any law interfering with the liberty of conscience.
Section 10 prohibits any legislation establishing religious wor-
ship. Section 11 preserves the right of trial by jury. Section
12 preserves personal rights from legislative interference,
except such as are made to apply upon others under like cir-
cumstances. Section 14 prevents interference with full pro-
tection of the law to all; and the enactment of any laws *ex
post facto.* Section 15 requires that all courts shall be public.
Section 16 requires that bail shall be given except in certain
cases. Section 17 secures the right of *habeas corpus.* Section
18, that no man shall be put twice in jeopardy of his life.
Section 19 regulates petit crimes and the grand jury. Section
20 provides an estate in homestead, and regulates imprison-
ment for debt. Section 21 provides that no bill of attainder,
*ex post facto* law, nor any law impairing the obligation of con-
tracts, shall be enacted—no corruption of blood or forfeiture of
estate. Section 22 prescribes that no warrant for search and
seizure shall be issued but in cases and with the formalities
prescribed by the laws. Section 23 regulates the enactment of

laws under eminent domain. Section 24 prescribes that the General Assembly shall alone provide for the suspension of the laws. Section 25 restricts the authority to declare martial law to the authority of the General Assembly. Section 28 restricts the interference with the right to bear arms, etc., to the General Assembly. Section 29 relates to quartering soldiers in times of peace in any house without the consent of the owner, except in a manner prescribed by law. Section 33 provides that right of suffrage shall be protected by laws regulating elections, etc. Section 34 relates to representation, and forbids any interference therewith, except by a trial by jury or law of the land. Section 36 relates to taxation, and requires *ad valorem* taxation. Section 37 requires that no subsidy, impost tax or duties shall be levied without the consent of the people, or their representatives lawfully assembled. Section 39 relates to letters of nobility or distinction. Section 40 relates to the navigability of waters within the State. Section 41 provides that the enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people.

By the first section of article 2 of our Constitution it is provided: The legislative power of this State shall be vested in two distinct branches, the one to be styled the "Senate" and the other the "House of Representatives," and both together the "General Assembly of the State of South Carolina." By section 1 of article 1 of the Constitution of South Carolina, adoped in June, 1790, it was provided: "The legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives." 1 Stat., 184. The Constitution adopted in 1790 virtually was of force until April, 1868, when the present Constitution was adopted, so we will speak of the former as the old Constitution, and the latter as the new Constitution.

Prior to the formation of the national government and after this State had ceased to be a colony of Great Britain, the State of South Carolina was one of the sovereign states of the world. Its power of legislation was as unlimited as the Parliament of

Great Britain. Having entered the Union of States, it parted with as much of its sovereign power as was vested by the Constitution of the United States and its amendments in the government of the United States. These grants of power so parted with were enumerated in the Constitution of the general government, but all the balance of its sovereign powers were retained by the people, and were confided by them to the governmental agencies created in the organic law, the State Constitution. One of these governmental agencies, as we have seen, was the legislature. It became necessary for the courts to define the constitutional provision creating this department, and we propose to show that, both under the old and the new Constitutions, the words used in both instruments have been determined by the courts of last resort in this State to mean that the whole legislative power of the State of South Carolina was devolved upon the General Assembly, limited only by restriction upon the exercise of such legislative power by the Federal Constitution on the one hand, and by the State Constitution upon the other.

In *Osborne* v. *Huger*, 1 Bay, 198, speaking of the power of the legislature of this State, Mr. Justice Bay said: "To suppose that the *supreme legislature* of the *sovereign country* has no right to regulate the conduct of its officers and the mode of business, would be straining the matter very far indeed." (Italics mine.) Judge Richardson said, in *State* v. *Hutson*, 1 McCord, 242: "But by the Constitution of this State all legislative authority, with very few restrictions, is given to the legislature or General Assembly. A law then, when enacted by that body, must be deemed constitutional, unless it comes plainly within some constitutional exception to the general power of legislation." Judge David Johnson said, in the *State* v. *Williams*, 2 McCord, 304: "The Constitution confers on the legislature a general power to legislate, with only two classes of limitations, those that are directory and those that are prohibitory. You shall do this and you shall forbear to do that." Chief Justice John Belton O'Neall said, in *Copes* v. *Charleston*, 10 Rich., 491: "I know no restrictions on legislative powers which in this State is vested by the Constitution in the General Assembly,

except those which deny certain powers, or which, by implication, arise because certain powers are conferred on Congress. So far as legislative power is concerned, I agree that, subject to the restrictions which I have suggested, the General Assembly has all the powers of the Parliament of Great Britain."

So much for the decisions of our courts of last resort upon the grant of power to the legislature rendered prior to the 16th of April, 1868. Let us see what this court has laid down since that date. Mr. Justice Willard, as the organ of the court, said, in the case of *State* v. *Hayne*, 4 S. C., 420: "Although the particular office of this section (section 1 of article 2 of our Constitution) is to fix certain important features of the body through which the function of legislation is to be exercised, yet it describes in an authoritative way the nature of the power thus vested. It is no less than the legislative power of the State. It is not such and so much of the legislative power of the State as were intended to be used by that particular body, but it was the whole legislative power of this State, its whole capacity for making laws, and providing a means for their enforcement. It was not intended that the legislature should exercise power without limitation or restraint, for the Constitution, that uses these words of grant, imposes many such restrictions and limitations affecting the extent to which it may be effectually exercised." So, too, Mr. Justice McGowan, in *Pelzer, Rodgers & Co.* v. *Campbell*, 15 S. C., 592, said: "The legislature is a law-making power of this State upon all subjects not prohibited by the Constitution, every part of which should, if possible, be so construed as to allow full force to section 1 of article 2, which vests the full legislative power of the State in the General Assembly. The English Parliament, in a political sense, is omnipotent, but with us it is the people, and *the people speak through the legislature, except when restricted by the Constitution of the United States or this State.* No statute can be disregarded unless a constitutional violation can be pointed out." Equally as explicit is the same justice in *Ex parte Lynch*, 16 S. C., 33, and the justice who delivered the unanimous opinion in *Utsey* v. *Charleston &c. R. R. Company*, 38 S. C., 399.

But what say the United States Supreme Court on this sub-

ject? Said Mr. Justice McLean in License Cases, 5 How., 587: "Before the adoption of the Constitution (U. S.) the States possessed respectively all the attributes of sovereignty. In their organic laws they had distributed their powers of government according to their own views, subject to such modifications as the people of each State may sanction. * * * The Federal government is supreme within the scope of its delegated powers, and the State governments are equally supreme in the exercise of those powers not delegated by them (to the U. S.) nor inhibited to them." I am sorry that the extended references to our own decisions and those of other States in relation to the extent of the legislative power in the States will forbid my resorting at this point to more extended notice of the decisions of the Supreme Court of the United States. Upon investigation it will be found that no decisions rendered by that court assert any greater restrictions upon the legislative power in the States than I have already admitted, except an *obiter dictum* of Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat., 383, in a dissenting opinion by Mr. Justice Brewer, 143 U. S., 551, and the guarded language of Mr. Chief Justice Fuller in 148 U. S., 661, when he said: "Irrespective of the operation of the Federal Constitution and restrictions asserted to be inherent in the nature of American institutions, the general rule is that there are no restrictions upon the legislative power of the Legislature of a State except those imposed by its written Constitution."

It will be noticed that Chief Justice Fuller does not admit the existence of the social compact theory; he merely says it is arrested. A very pungent article on this subject by Richard C. McMartin, Esq., in the American Law Register and Review of December, 1893, uses these words: "Could there be found one man that would consent to thus transfer the sovereignty of the nation from its representatives to a court by enacting *that all legislation contrary to the said compact shall be void, and what that compact is the judges shall be the final arbiters, and they are to ascertain it from their own notions as to what it ought to be assumed to have been.*" This legal heresy had disappeared from early in this century until recently.

What do some of the other States of this Union hold? Un-

questionably the judgment of the Supreme Court of Pennsylvania, announced by that splendid jurist, Chief Justice Jeremiah S. Black, in *Sharpless* v. *Mayor of Philadelphia,* 21 Penn. St. Rep., 169, has been recognized by the Supreme Court of the United States and the courts of the different States of the Union as the leading authority on this subject. I can recall at least four instances where this decision has been recognized in this State: *Copes* v. *Charleston, supra; State* v. *Hayne, supra; Pelzer, Rodgers & Co.* v. *Campbell, supra;* and *Utsey* v. *R. R. Co., supra.* This judge said: "The powers bestowed on the State government were distributed by the Constitution to three great departments—the legislative, the executive, and the judicial. The power to make laws was granted in section 1 of article II. by the following words: 'The legislative power of this commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.' It is plain that the force of these general words, if there had been nothing elsewhere to qualify them, would have given to the assembly an unlimited power to make all such laws as they might think proper. They would have had the whole omnipotent power of the British Parliament. But the absolute power of the people themselves had been previously limited by the Federal Constitution, and they could not bestow on the legislature authority which had already been given to Congress. * * * The jurisdiction of the assembly was still further confined by that part of the Constitution called 'the declaration of rights,' which in twenty-five sections carefully enumerated the *reserved rights* of the people, and closes by declaring that everything in this article is excepted out of the general powers of the government and shall remain forever inviolate. The General Assembly cannot, therefore, pass any law to conflict with the rightful authority of Congress, nor perform a judicial or executive function, nor violate the popular privileges reserved by the declaration of rights, nor change the organic structure of the government, nor exercise any other power prohibited in the Constitution. If it does any of these things, the judiciary claims and in clear cases has always exercised the right to declare such acts void. * * * We are urged, however, to go further than this, and to hold that a law, though

not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the right of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. It would be assuming a right to change the Constitution, to supply what we conceive to be its defects, to fill up every *casus omissus*, and to interpolate into it whatever in our opinion ought to have been put there by its framers. The Constitution has given us a list of what the legislature may not do. If we extend that list we alter the instrument, we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature could. If we can add to the reserved rights of the people, we can take them away; if we can mend, we can mar; if we can remove the landmarks which we find established, we can obliterate them; if we can change the Constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely." See, also, *People* v. *Flagg*, 46 N. Y., 404; *Stewart* v. *Board of Supervisors of Polk County*, 30 Iowa, 9. But space bids us desist.

Now as to the opinions of text writers. Mr. Bishop, in his work on the Written Laws, at section 92, says: "The Constitution of the United States consists chiefly in a grant of enumerated powers; hence in interpreting it the courts presume the existence of no powers not expressly or impliedly conferred. On the other hand, a State Constitution proceeds on the idea that all legislative functions are in the legislature; therefore, in its interpretation the powers not taken away by the United States Constitution are presumed, excepting as expressly or by implication denied." Mr. Cooley, in his work on Constitutional Limitations, page 307, says: "All legislative power is conferred upon the senate and assembly, and if an act is within the legitimate exercise of that power it is valid, unless some restriction or limitation can be found in the Constitution itself. The distinction between the United States Constitution and our State Constitution is that the former confers upon Congress certain specific powers only, while the latter confers upon the Legislature all legislative powers. In the one case all legislative powers not prohibited may be exercised." I might go

forward and quote other text writers, but Mr. Cooley is recognized as standard authority.

Thus our own State Courts, those of the United States Supreme Court, the Supreme Courts of other States, and standard text books on constitutional law, plainly show that this modern dress to an exploded idea is not sustained by authority, and that the authority of the Legislature of this State to enact laws is only restricted by our own Constitution and that of the United States, as is in such instrument actually specified or necessarily implied from such restrictions there plainly expressed.

We are now prepared at the next step in our investigation to see wherein the Dispensary Act violates the Constitution of this State. I say State, for the opinion prepared by the majority of this court is exceedingly careful to confine the discussion to the State Constitution, so as not to include the questions suggested in the court below as to Federal questions. It is suggested that this act violates at least two of the sections of the State Constitution. What are these? It may be as well to quote these sections from the text of the Constitution itself. Section 1 of article 1 provides, "All men are born free and equal, endowed by their Creator with certain inalienable rights, among which are the rights of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness." Section 12 provides, "No person shall be disqualified as a witness, or be prevented from acquiring, holding, and transmitting property, or be hindered in acquiring education, or be liable to any other punishment for any offence, *or be subjected in law to any other restraints or disqualifications in regard to any personal rights than such as are laid upon others in like circumstances.*" (Italics mine.) Section 14 provides, "No person shall be arrested, imprisoned, despoiled or dispossessed of his property immunities or privileges, put out of the protection of the law, exiled or deprived of his life, liberty or estate, *but by the judgment of his peers or the law of the land,* and the General Assembly shall not enact any law that shall subject any person to punishment without trial by jury, nor shall he be punished but by virtue of a law already established or

promulgated prior to the offence and legally applied." Section 41 provides, "The enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people."

I have thus taken the pains to reproduce the text itself, so far as these sections are concerned. Let us now take the pains to investigate the claims set up in the opinion of the majority of this court as to the inalienable rights of the citizen. I submit that the true office of section 1 of article 1 has been obscured. It is true, it is there stated that life, liberty, property, tranquility or safety and happiness are therein set up as inalienable rights. What is meant by these terms? Surely no one for a moment will contend that these inestimable boons of a wise Providence in a civilized community mean that life is to be preserved to an individual, no matter how many other lives are ruthlessly destroyed by him; that the liberty of a man is to be preserved as an inalienable right, when he has lost his senses and endangers the lives of others; that the property of a man is to be preserved as an inalienable birthright, if that man recklessly destroys the property, reputation, or liberty of his fellow-man, or that others must guarantee him safety if he is a murderer. No, for we find that, under this very Constitution, laws may be enacted to hang the murderer, the man guilty of arson and of rape; to imprison for life a man guilty of certain crimes, or one found guilty of fraud, or that even steals a chicken for food; to sell his property and every part of it to pay taxes due the government, and sell all except a homestead for debt. Let us cease these assertions of inalienable rights in the connection in which they are so frequently and with such unction lauded. The true view of this section is to lay down, in the first place, enumerated rights that individuals, acting in their own behalf, cannot disregard or destroy; and, in the second place, to call on the government in its different agencies to promote all these blessed rights of free men. These four sections of our Constitution should be construed together, and when this is done all is made clear and consistent, the one clause with the other, and to accord with what we see taking

place around us in governmental affairs, both in the State and nation. Certainly the grand central thought in government is to secure the happiness and promote the welfare of the entire body of the citizens. And it was for this purpose the people established government.

The courts have construed these provisions in the sections of article 1 of our State Constitution. The meaning to be attached to the terms "privileges and immunities" was construed many years ago by Mr. Justice Washington, in *Corfield* v. *Coryell*, 4 Wash. C. C. Rep., 371, as follows: "They may all, however, be comprehended under the following heads: Protection by the government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue happiness, *subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole.*" This definition has been accepted by the United States Supreme Court and by the courts of the States. So far as government is concerned, no rights may be said to be absolute; they are all held subject to such restraints as the government may impose for the general good of the whole. In regard to land, our State Constitution, in addition to the general restrictions upon its enjoyment by its owner as his property, declares its ultimate ownership is in the people. Therefore, wherever the rights enumerated in *Corfield* v. *Coryell, supra*, and which appear in our declaration of rights, are involved, it may be regarded as settled in accordance with the view that they are subject to such restraints as the government may justly prescribe for the good of the whole.

An examination of sections 12 and 14 plainly declare that personal rights shall not be ruthlessly, or capriciously, or unnecessarily, or partially invaded by the government for "the good of the whole," but that the same shall only be interfered with (in the 12th) in the same manner "as are laid upon others under like circumstances;" and (in the 14th section) no interference with personal rights, except "by the judgment of his peers or the law of the land." By the term judgment of his peers is meant trial by jury. And "the law of the land" has been carefully considered in this State in the cases of *Zyl-*

*stra*, 1 Bay, 384; *White* v. *Kendrick*, 1 Brev., 471; *State* v. *Maxey*, 1 McMull, 502; *State* v. *Simons*, 2 Speer, 644; 5 Rich., 175; 2 Bail., 677; 10 Rich., 440. Chief Justice O'Neall, in *State* v. *Simons*, *supra*, said: "There can be no hesitation in saying that these words mean the common law and the statute law existing in this State at the adoption of our Constitution (1790). Altogether they constitute the body of law, prescribing the course of justice to which a free man is to be considered amenable in all times to come." Bear in mind that the making of a Constitution is always preceded by the existence of a society of people who make it. Our forefathers, as before remarked, had not only the common law of the mother country, but also statutes they had previously enacted and lived under. The idea in forming a new Constitution is always to correct, by enlargement, modification, or negative of laws previously existing, by the people of the State. Thus, we find in 1868, when our present Constitution was adopted, it eliminated very carefully laws that were objectionable. For example, "slavery," "corporate privileges," "restrictions upon banks," etc. The same terms, "the laws of the land," which were used in the old Constitution, were retained in the new Constitution of 1868; so the definition of these words and the others I have quoted were used in both instruments, and are to be construed by us to mean what the decisions I have quoted declared them to mean. Thus it is made manifest that what has been declared to be the meaning of the 1st, 12th, and 14th sections of article 1. of our Constitution cannot legitimately be construed as has been contended.

Now, as to section 41. When that section is examined, it will be seen that it does not cover the case of rights and powers as expressed in the instrument, for these words are used, not "to impair others retained by the people;" that is, not set out in the instrument. "And all powers not herein delegated remain with the people." Full legislation had been, and was, granted by this very instrument. But we need not cast about for the meaning of this section. It has already been construed by this very court in *State* v. *Hayne*, 4 S. C., 421, where Mr. Justice Willard uses this language: "The true effect of this declaration (41st section of article 1) is, that it reserves to the

people whatever is not granted by the instrument; as, for instance, the right to make changes in the form of government is not granted, and, under this clause, remains with the people, capable of exercise when they see fit so to do. As the legislative power is granted in express terms, importing a grant of general powers, such grant of general powers of legislation cannot be regarded as reserved to the people under this section. Such general language as that contained in section 41 of article 1 cannot be allowed such force and effect as to change entirely the nature of the legislative power, and to introduce anomalous ideas in the structure of the government." And this decision has been approved by several other decisions of this court. Mr. Cooley, in his great work on Constitutional Law, at page 68, says: "A cardinal rule in dealing with written instruments is, that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A Constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as, perhaps, to make a different rule in the case seem desirable. A principal share of the benefits expected from written Constitutions, would be lost if the rules they establish were so flexible as to bend to circumstances, or be modified by public opinion."

Having thus fixed ideas as to the meaning of these four sections of our Constitution, let us patiently examine the Dispensary Act, to ascertain what its nature, scope, and object are, to the end that we may justly apply other principles of law duly involved. It may be as well to settle definitely what is the nature, scope, and object of the act of 1892. Its title declares it to be "An act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided." Now, what was the law in this State regulating the manufacture and sale of intoxicating liquors as a beverage on the 24th day of December, 1892? "It shall be unlawful for any person or persons to sell spirituous or intoxicating liquors without a license so to do." "No license for the sale of spirituous or intoxicating liquors shall be granted in South Carolina outside of the incorporated cities, towns, and

villages of this State." Section 1731, General Statutes. Not only so, but all citizens living in certain towns, cities, and counties, under local option laws of this State, were not allowed to sell under license, or otherwise, such spirituous or intoxicating liquors. An exception was also made under an act allowing the counties of Charleston, Beaufort, Colleton, Berkeley, and Hampton to allow licenses to sell such liquors outside of such incorporated cities and towns, so that, by the title to this act, its declared purpose was to revoke all powers to license the sale of intoxicating liquors as a beverage, if the same were not recognized in the body of the act.

Pause just a few moments longer before we dissect the provisions of this act, and remember some other pregnant truths. Intoxicating liquors, to be sold under license in this State, required that each applicant for such license should, as a condition precedent to such permit, enter into a bond, in the penalty of $1,000, conditioned that he would obey the laws of the State pertaining to the conduct of the sale of spirituous liquors as a beverage. The force of public opinion was so great, that many good men dared not face the obloquy of engaging in the business. Some of the greatest of our churches incorporated it into their organic laws, that he who sold liquors as a beverage should not be received or retained in their membership. The evils of the business were so great—as to gambling in such places, as to the sale to minors, as to the sale to habitual drunkards, and as to the losses to families by reason of the heads of such families drinking too much—that special statutes had been enacted to punish the saloon keepers for sales to such persons. But, towering above all these evils, a more dreadful one still struck terror into the breasts of all good men. The sanctity of the home of our women was constantly jeopardized by the inflammation of the brutal passions of the low and vicious amongst us by strong drink. Under these circumstances and others, notably the expression of the ballot box in November, 1892, by a majority of more than 10,000 votes, the people had demanded the passage of a law prohibiting the sale of intoxicating liquors. The experience of other States, where prohibitory laws had been enacted, had failed to convince this

country that as yet such laws accomplished their most beneficent aims.

Under all these circumstances the legislature of this State passed this act, whereby the manufacture and sale were prohibited to the citizens as such. It undertook to confine the sale to the agents of the State, to be selected for such work because of their well-known sobriety and character for uprightness of life. The general agent was called the commissioner, who, under a board of control, consisting of the governor, the comptroller general, and attorney general, should purchase all intoxicating liquors, should have each and every part of the same analyzed by the state chemist, and declared by him pure and unadulterated. Such commissioner should sell such liquors to the county dispensers at not greater profit than fifty per cent. above the net cost thereof. The commissioner was required to execute a bond in the penalty of $10,000, conditioned for the faithful discharge of his duties. He was to pay all moneys received from sales into the state treasury monthly. Such commissioner was required, when his duties were not fixed by law, to obey such rules and regulations as were prescribed by the state board of control. He was paid a stated salary and commissioned by the State. County dispensers might be appointed in this State, except in those counties and towns in this State where an act of the legislature had declared licenses to sell liquors should not exist. These county dispensers were to be selected by county boards of control, to be appointed by the governor. Such county boards of control could not issue permits to such county dispensers until: 1. The city or town where such dispensary was to be established should, by a petition signed by a majority of the freehold voters of such city, or town, or township, request the same, and certify in such petition to the good character and sobriety of the applicant, which applicant should enter into a bond in the penalty of $3,000, conditioned for the faithful discharge of his duties under this law.

His duties under the law were: 1. To obey the regulations of the county and State boards of control. 2. To sell liquors at a profit not greater than fifty per cent. of their cost, and for

cash. 3. To keep open his place of business in the exact building designated in his permit from the county board of control. 4. To retain the packages of liquor as received from the State commissioner without any seals being broken; to sell such sealed packages, ranging from a half pint to five gallons, without any seal being broken, and such seals not to be broken in the building used for such sale; and no part of such liquor. shall be drunk at the place of sale. 5. No sale shall be made by the county dispenser or his clerk unless upon a printed or ink written application, to be signed by the applicant himself, and witnessed by the signature of the county dispenser or his clerk, on blank forms to be furnished by the county auditor, wherein shall appear the true date of the sale, the place of residence of the applicant, the kind and quality of liquors so sold; nor shall such sale be made unless the county dispenser knows the applicant personally or has such applicant identified by a responsible person, not to be a person who is drunk at the time of the purchase, or who is a minor, or who is addicted to drink in excess. 6. Every county dispenser shall report his sales each month, shall file a report thereof with the proper officer, shall keep a book wherein is enumerated the purchase of any kind and all kinds of liquor, which shall always be opened to the public. 7. Every county dispenser shall file with the county auditor the applications for the sale of liquors, and make affidavit that he filled such applications as made therein and no other; and that no more than one sale was made under each application. 8. No county dispenser shall be allowed to sell any other intoxicating liquors than such as he may purchase from the State commissioner, nor shall he adulterate, or cause to be adulterated, any intoxicating, spirituous or malt liquors which he or they shall keep for sale under this act, by mixing with the same any coloring matter, or any drug or ingredient whatever, or shall mix the same with other liquors of different kinds or quality, or with water, or shall sell or expose for sale so adulterated, knowing it to be such, under the pains of being tried for a misdemeanor, and subject therefor to a fine of not less than $200 or imprisonment in the county jail for not less than six months. 9. No county dispenser could

hold his office as of right, but as a trust reposed in him, and with the liability to have his permit cancelled at any time within the discretion of the county board of control. 10. He should be liable to suit for any civil damage accruing to a wife, child, parent, guardian, employer, or other person under the provisions of law; and his bond should be the basis of such suits, if any. 11. His permit could, in no case, extend beyond one year from its date. 12. Sales could also be made by county dispensers to licensed druggists or manufacturers of proprietary medicines, of intoxicating liquors (except malt liquors) for the purpose of compounding medicines, tinctures, and extracts that cannot be used as a beverage. Such sales should only be at a profit of not over ten per cent. net profits for liquors so sold. 13. All profits accruing to the business so conducted by the county dispensers should be paid, after providing for all expenses of the county dispensary, one-half to the county treasury and one-half to the municipal corporation in which it was located.

By the 18th section it is provided that the sum of $50,000, if so much be necessary, be appropriated for the purpose of purchasing and of supplying liquors to be distributed to county dispensers under the provisions of this act, to be expended by the State treasurer upon the requisition of the State commissioner, with the approval of the State board of control; provided, that the amounts advanced to each county dispenser shall be considered loans, to be refunded out of the profits derived from the sales of liquors by the county dispensers.

By the 6th section of the act it is provided: "That on and after the first day of July, 1893, no person, firm, association or corporation shall manufacture for sale, sell, keep for sale, exchange, barter or dispense any intoxicating liquors for any purpose whatever, otherwise than is provided in this act; * * * provided, that no license for the sale of spirituous liquors now authorized to be granted by municipal authorities shall be of any force or effect after the 30th day of June, 1893; but licenses may be issued or extended to said 30th day of June, 1893, upon payment of one-half of the annual license required by the municipal and county authorities in cities or towns

18—41

where such licenses are or may be authorized to be issued:
Provided, further, that manufacturers of distilled, malt or
vinous liquors who are doing business in this State shall be
allowed to sell to no person in this State except to the State
commissioner, and to parties outside of the State. Every
package, barrel or bottle of such liquors shipped beyond the
limits of the State shall have thereon the certificate of the State
commissioner, allowing the same, and otherwise, it shall be
liable to confiscation, and the railroad carrying it shall be
punished as in section 2; and provided, that any person shall
have the right to make wine, for his or her own use, from
grapes or other fruit."

Section 21 provides: "Every person who shall directly or
indirectly keep or maintain by himself, or by associating or
combining with others, or who shall in any manner aid, assist,
or abet in keeping or maintaining any club room or other place
in which intoxicating liquors are received, or kept for the pur·
pose of barter or sale as a beverage, or for distribution or
division among the members of any club or association by any
means whatever; and any person who shall barter, sell, or
assist or abet another in bartering or selling any intoxicating
liquors so received, or kept, shall be deemed guilty of a mis-
demeanor, and upon conviction thereof, be punished by a fine
of not less than $100 nor more than $500, and by imprisonment
in the county jail for not less than ninety days nor more than
one year."

Section 22 provides: "All places where intoxicating liquors
are sold, bartered, or given away, in violation of this act, or
where persons are permitted to resort for the purpose of drink-
ing intoxicating liquors as a beverage, or where intoxicating
liquors are kept for sale, barter, or delivery, in violation of this
act, are hereby declared to be common nuisances; and if the
existence of such nuisance be established, either in a criminal
or an equitable action, upon the judgment of a court or judge
having jurisdiction, finding such place to be a nuisance, the
sheriff or his deputy, or any constable of the proper county or
city where the same is located, shall be directed to shut up and
abate such place by taking possession," &c.

Now, in view of these features, distinctly supplied by the provisions of the act in question, can it be fairly inferred that the nature, scope, and object of the act was to raise revenue for the State and its municipal corporations, as is contended in the opinion of the majority of this court? Notice that the sales provided for are not so fixed as to raise a revenue, although it is not denied that a revenue may result from its enforcement. Sales by the State commissioner are not to be made at a profit of fifty per cent. over cost, but shall not exceed that sum. Sales by county dispensers are not fixed at fifty per cent. above cost, but they shall not exceed that limit. Would it not be a strange and unusual construction of a provision in a criminal law, which provided $200 as a minimum and $500 as a maximum fine as a punishment, to say the judge who passed sentence must affix $500 as the fine? These matters are merely left to the discretion of the State board of control in the State commissioner's case, and to the county board of control in the case of county dispensers. Nor are the provisions of this law such as to induce generous buying by the community. No man prefers to sign his name to an application to be allowed to buy intoxicating liquors as a beverage. No man prefers that such testimony shall be preserved in a permanent form. Besides, is it not one of the most potent objections to the traffic in intoxicating liquors, that they are adulterated? All this is prevented under this act. Is it not admitted that the strongest temptation to drink in bar rooms is the social feature of men drinking together? Is it not the experience of the world that intoxicating liquors are not so liable to be taken to excess except when obtained in the bar room?

We submit, therefore, that it is unjust to the act in question to ascribe to it, as its leading and controlling feature, the receiving of a revenue for the State and its municipalities. The proper construction is, that in the exercise of the State's undoubted police power, in order to promote sobriety, preserve the health, and provide for the safety of her citizens, the State has passed this law prohibiting the sale of spirituous liquors by private persons; but recognizing the demand for pure, unadulterated liquors, she has created a governmental agency,

under strict regulations, to sell those liquors with enough profit thereon to pay the expenses of the purchase of these liquors, the expenses of conducting the business and to police the State to prevent infractions of her laws in this act provided.

We will next consider what power has been applied in this State and the other States of this Union, as fixed by our own decisions, those of the Supreme Court of the United States, other State Courts, and as supported by eminent text writers in the suppression altogether or the regulation of the liquor traffic.    In the beginning it is admitted that the legislature of this State has never hitherto exercised the power, by its direct enactments for that purpose, to prohibit the sale of intoxicating liquors as a beverage throughout the entire State.   What effect the local option laws may have in this direction may be consi- dered presently.    These local option laws were enacted in 1882. See 17 Stat., 893.    The State, however, as before remarked, has always had and enforced the license as a prerequisite to the re- tailing of spirituous liquors.    Among the cases decided before the new Constitution are found *Heisembrittle* v. *City Council*, 2 McMull., 236; *City Council* v. *Ahrens*, 4 Strob., 257.    Since the year 1868, among such decisions these decisions may be found: *State* v. *Thornburg*, 16 S. C., 484; *State* v. *Mancke*, 18 *Id.*, 84; *State* v. *Turner*, *Ibid.*, 105; *State* v. *Chester*, *Ibid.*, 468; *State* v. *Berlin*, 21 *Id.*, 296; *State* v. *Neese*, 38 *Id.*, 261.

In *State* v. *Thornburg*, *supra*, Mr. Justice McGowan delivered the opinion, upholding the conviction of a citizen for selling a small quantity of whiskey to be used as a medicine for a con- sumptive—the sale having been made outside of an incorporated city, town or village, where alone it was lawful to sell intoxicat- ing liquors.   In the case of *State* v. *Mancke*, *supra*, Mr. Justice McGowan, delivering the opinion of the court, held that the act of 1880 (17 Stat., 459), requiring a license fee to be paid for the use of the county in addition to the municipal license, was constitutional.    In the case of *State* v. *Turner*, *supra*, Mr. Jus- tice McIver delivered the opinion of the court, and said: "We presume, however, from the course of the argument here, that the main object of this ground (of appeal) was to assail the constitutionality of the act of 1880.    The power of the legisla-

ture to regulate the sale of spirituous liquors has been too long and too well settled to admit of question at this late day.    Experience has demonstrated that the unrestrained traffic in spirituous liquors is dangerous to the peace and welfare of society, and, therefore, it has long been settled that the law-making power may throw such restraints around that traffic as, in the judgment of that department of the government, may be necessary to secure the peace and welfare of society; and persons who wish to deal in such an article must conform to the regulations prescribed, or *they cannot claim the right to do so.*    (Italics mine.) *There is nothing in the Constitution of the United States or of this State which forbids the legislature from exercising this power."*

In *State* v. *Chester, supra,* Mr. Chief Justice Simpson held, in delivering the unanimous opinion of this court, in passing upon the constitutionality of the act of 1882 (17 Stat., 893), known as the "Local Option Act," which provided that upon the petition of one-third of citizens who voted at the next preceding municipal election of any incorporated city, town, or village, the council of such city, town, or village was authorized and required to submit the question of license or no license to the qualified electors of such city, town, or village, at a special election to be holden, etc., and if a majority voted for no license, it should be unlawful to issue any licenses for the sale of spirituous liquors within the limits of such city, town, or village (this act was assailed as unconstitutional, because in violation of the twelfth section of article 1 of our Constitution), that the local option law did not impinge upon the said *twelfth section,* nor any other provision of that instrument, alleged in that case.    In the case of *State* v. *Berlin, supra,* when the unanimous opinion was delivered by Mr. Justice McIver, it was held, quoting from the syllabus of the case, that the act of the legislature prohibiting the sale of spirituous liquors outside of incorporated cities, towns, and villages, while permitting such sale under license within cities, towns, and villages, does not violate article 1, section 12, of the Constitution of this State, nor the 14th amendment of the United States Constitution.    Laws regulating the sale of liquors are police regulations, and the legislature may prescribe different regulations in different localities, but such

laws must apply equally to all persons within the territorial limits affected. Mr. Justice McIver used *inter alia* these words: "*It must also be remembered that laws regulating the sale of spirituous liquors are to be regarded as police regulations, over which the State has absolute control, limited only by some constitutional prohibition. The State, therefore, in the exercise of this police power, may pass laws absolutely prohibiting the sale of spirituous liquors, except unbroken packages while in the hands of the importer, and except, perhaps, when the rights of property, existing at the time of the passage of the law, might be destroyed,* or it may throw around such traffic such restraints *as, in the judgment of the legislature,* may be most conducive to the peace and good order of society, by preventing the evils which might flow from an unrestrained traffic in such articles. License Cases, 5 How., 504; *Bartemeyer v. Iowa*, 18 Wall., 129," and two State cases. Mr. Justice McGowan concurred in this opinion, as did, also, the then Chief Justice, Simpson. So much for our own State decisions.

Every State in this American Union admit the right of the legislature to control by regulations and license the sale of spirituous liquors, and ascribe this power in the State governments to the police power; and only two States, by the decisions of their courts of last resort, have decided against the right of prohibition, and then by divided courts. See *Wynehamer v. People*, 13 N. Y., 398, and *Beebe v. State*, 6 Ind., 501. In the first of these cases just cited, it will appear that this right of prohibition had some side features, property on hand, to control the judgment of some members of the court of New York. And in the Indiana case it has been either overruled or modified by a later judgment of that State, according to a note in Tiedeman on Limitations of Police Powers. I have only space to quote a few of the State decisions: *Our House v. Green*, 4 Green (Iowa), 172; *Lincoln v. Smith*, 27 Vt., 328; *State v. Wheeler*, 25 Conn., 290; *State v. Robinson*, 33 Maine, 568; *State v. Barrels of Liquor*, 47 N. H., 369; and many others.

Mr. Cooley, at page 718 (6th edition), sums up very admirably the decisions of the United States Supreme Court affirming the rights of the States to prohibit or to regulate "these State laws, known as prohibitory liquor laws, the purpose of

which is to prevent altogether the manufacture and sale of intoxicating drinks as a beverage, so far as legislation can accomplish that object, cannot be held void as in conflict with the 14th amendment, * * * the same laws have also been sustained when the *question of conflict with State Constitutions or with general fundamental principles* has been raised. They are looked upon as police regulations established by the legislature for the prevention of intemperance, pauperism, and crime, and for the abatement of nuisances." In a note at this page he adds, if the State so determine, it may forbid the manufacture, sale, and use of liquor as prejudicial to public health, safety, and morals, even though thereby existing property is depreciated in value without compensation. *Mugler* v. *Kansas*, 123 U. S., 623; *Kidd* v. *Pearson*, 128 U. S., 1; *Bartemeyer* v. *Iowa*, 18 Wall, 129; *License Cases*, 5 How., 504; and many other cases. All of these decisions ascribed the control of the sale of liquor to the exercise of the police power of the State. Mr. Cooley, at page 706, quotes with decided approval the language of Chief Justice Redfield in the famous case of *Thorpe* v. *Rutland & Burlington Railroad Co.*, 27 Vt., 140: "By this general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the State, of the perfect right in the legislature to do which no question ever was, or upon acknowledged general principles ever can be made, so far as natural persons are concerned. And neither the power itself nor the discretion to exercise it can be bargained away by the State." *Beer Company* v. *Massachusetts*, 97 U. S., 25; *Boyd* v. *Alabama*, 94 U. S., 645.

Thus, too, the recent work of Parker and Worthington on Public Health and Safety, at page 24: "The police power of the State is fully competent to regulate the business (sale of intoxicating liquors), to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to make or sell intoxicating liquor. Inasmuch as it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. Consequently, statutes pro-

hibiting the manufacture or sale, or keeping for sale, of intoxicating liquors as a beverage, and declaring all places where such liquors are manufactured or kept for sale in violation of the statute to be common nuisances, and forbidding their future use for the purpose, and authorizing courts to restrain violations of the law by injunctions, and to punish the disregard of their injunctions as a contempt by fine or imprisonment, or both, do not infringe any right, privilege, or immunity of the citizens secured by the Constitution of the United States. They do not deny to the citizens whom they affect the equal protection of the law nor deprive them of property without due process of law.  *  *  *  Intoxicating liquors are but an example of a class of things that may be made subject to State regulations, such as those just mentioned." Mr. Tiedeman, in his extended work on Limitations on Police Power, is quite as distinct in his recognition of the foregoing views being established as fixed leading principles in this country.

Lastly, we will consider some of the specific objections set out in the opinion of the majority of this court in this case to the Dispensary Act, as being in excess or beyond the limitations of law.  It is objected to as interfering with the inalienable rights of the citizen.  I propose to show that this court, and notably the justices who unite in the opinion in this case, are inconsistent, by reason of this opinion being at variance with other opinions they have given officially.  It must be understood that I am dealing in personal kindness with them, for I am actuated by these feelings.  But my duty to the whole people of this commonwealth, whose servant I am, requires that I shall not permit such, to my mind, glaring inconsistency to pass without exposure, especially as it so nearly concerns the welfare of this people.  In a previous part of this opinion I have quoted cases in which both took an active part, where it was held by them that the inalienable rights of citizens were not affected by the restraints placed upon the liquor traffic, even though they were the people whose right it is to labor, to have freedom, etc.  I refer to the decisions of *State* v. *Thornburg, supra; State* v. *Mancke, supra; State* v. *Turner, supra; State* v. *Chester, supra; State* v. *Berlin, supra;* where they held that the

citizens of South Carolina, living outside incorporated cities, towns, or villages, had no constitutional right to sell intoxicating liquors, and that the denial by the State of such right did not impinge upon any rights of the citizen. as sustained by an appeal to the 12th section of article 1 of our Constitution. They may attempt to escape from this dilemma, that the act which forbade any person to sell liquors outside of an incorporated city, town or village, was general in its application to all the citizens who lived outside those limits. The Dispensary Act applies to every citizen of the State, and they think this act unconstitutional. So, too, as to the local option laws. They were declared to be constitutional, and as not trenching upon the rights of the citizen, when he appealed for protection to the 12th section of article 1 of our Constitution. And yet they hold the Dispensary Act, which, as I before said, applies to the whole State, unconstitutional, as denying the right of the citizen to sell spirituous liquors, in violation of this very section 12 of article 1 of our Constitution.

They have not only virtually overruled these cases I have quoted, but in doing so they not only transcend their powers under our State Constitution, but such a course of conduct is opposed to decision after decision of the United States Supreme Court. In the License Cases that court not only decided that the State had the right to legislate liquors up or down— either to license its sale or to prohibit its sale—but also that such laws did not trench upon any inalienable right of a citizen. Here is the language, McLean, J.: "No one, it is presumed, can claim a license to sell liquors as a matter of right." In *Mugler* v. *Kansas, supra,* Mr. Justice Harlan said: "*Such a right does not inhere in citizenship.* Nor can it be said that the government interferes with or impairs any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks for general or individual use as a beverage, are or may become hurtful to society, and constitute, therefore, a business in which no one may engage." Mr. Justice Field, in *Crowley* v. *Cristensen,* 137 U. S., 91, said: "Their sale. in that form may be absolutely prohibited. It is a question of public expediency and public

morality, and not of federal law. The police power of the State is fully competent to regulate the business—to mitigate its evils or to suppress it entirely. *There is no inherent right in a citizen to sell intoxicating liquors by retail.* It is not a privilege of a citizen of the State or of a citizen of the United States; * * * the manner and extent of regulation rest in the discretion of the governing authorities." These quotations might be multiplied, but time is pressing and I must forbear. I repeat it, these conclusions of the majority of this court, as to inalienable rights, is not only opposed by decisions previously made by them, but are in direct conflict with the judgments of the United States Supreme Court. Not only so, but I assert that there never was in South Carolina any inalienable right in the citizen to sell liquor as a beverage. It was always a privilege extended by government, surrounded by restrictions. No right can be said to be an inalienable one that is not inherent—like life, liberty, &c.

Nor is the power in the citizen to sell liquor as a beverage interfered with by the legislature, because done so by "a law of the land," for by the decisions of the court of last resort in this State, such a term includes the right either to license or to decline to license. If this be so, how can a law duly enacted by the legislature, declining to license any and all citizens, be opposed to the 12th and 14th sections? [The present] Chief Justice held, in *State* v. *Berlin, supra,* that neither restrictions on the sale of liquors, nor even prohibition itself, invaded any of the personal rights of the citizens under 12th section of article 1 of our State Constitution. In this Mr. Justice McGowan concurred. Contrast their utterances then with those announced to-day. In a previous part of this opinion I have shown that section 41 has already been construed by this court—*State* v. *Hayne, supra*—and that the views herein suggested by the opinion of the majority, virtually overruled that decision. Surely twenty-six years of acquiescence in a decision on a constitutional question ought to commend it to us. But it seems nothing is too sacred to be uprooted.

Again, it is objected that under the provisions of this act, the State is embarking in trade to the exclusion of her citizens.

In 10 Rich., 491, in the case of *Copes* v. *City of Charleston*, the question of the power of the State to confer upon one of her municipal corporations the right to embark in business was denied upon the ground that the State *did not possess that power herself*. The gravity of the question was so great that it was submitted to the Court of Errors, composed as it was of the whole judiciary of the State, law judges and chancellors, and hear what O'Neall, afterwards Chief Justice, as the organ of the court, said: "That the General Assembly have all the pow·ers which the corporation (city of Charleston) have exercised in their corporation, in and for the whole State, I have no doubt. If they (the General Assembly) thought proper, they could build a railroad with just as much propriety as a granite state house. Both might lead to an extravagant waste of money, but still the power cannot be questioned. They have dug canals and built roads, and I have no doubt that they will do so again. * * * The powers of the General Assembly in all these respects seem to me to be undoubted, and if so, why may they not clothe a municipal corporation with the same powers to be exercised for the benefit of the people of their charge. It seems to me clear that they can." This be-came the unanimous judgment of the court, concurred in by Chancellors Job Johnstone, Duncan, Dargan, and Wardlaw, and by Judges Withers and Whitner. This decision has been at least twice recognized by this court as law since the new Constitution went into effect. This court has also recognized the power of the legislature to clothe its municipal corpora-tions with like powers and affirm their constitutionality.

Again, on this point we have shown that by our own deci-sions as well as those of the United States Supreme Court, the right to sell intoxicating liquors as a beverage is not an inalien-able right in the citizen—in other words, that such a business is not of common right. Hence what Mr. Cooley says on this subject. At page 342 (6th edition), in his work on Constitu-tional Limitations, he says: "As every exclusive privilege is in the nature of a monopoly, it may at some time become a question of interest whether there are any, and if so what, lim-its to the power of the State to grant them. In former times,

such grants were a favorite resort in England, not only to raise money for the personal uses of the monarch, but to reward favorites; and the abuse grew to such enormous magnitude that Parliament, in the time of Elizabeth, and again in the time of James I., interfered and prohibited them.  What is more important to us is that in 1602 they were judicially declared to be illegal (*Dorsey* v. *Allen*, 11 Rep., 84).  *These, however, were monopolies in the ordinary occupations of life,* and the decision upon them would not affect the special privileges most commonly granted.  Where the grant is of a franchise which would otherwise not exist, no question can be made of the right of a State to make it exclusive unless the Constitution forbids it; because, in contemplation of law, no one is wronged when he is only excluded from that in which he never had any right.  An exclusive right to build and maintain a toll bridge, or put up a ferry, may, therefore, be granted; and the State may doubtless limit, by the requirements of a license, the number of persons who shall be allowed to engage in employments, *the entering upon which is not a matter of common right,* and which, because of their abuse, or of their liability to abuse, may require special and extraordinary police supervision.  *The business of selling intoxicating drinks and of setting up a lottery are illustrations of such employments.*"

Is there any consistency in denying to the present legislature the power to protect the health, the morals, and the safety of our people by regulating, and under proper agencies conducting, the business of providing pure and unadulterated liquors, when this court has repeatedly declared legislation for building railroads by county or city to be constitutional?  Very ingeniously it is suggested, how can the State regulate itself?  This is specious and unsound.  The people are the State.  The government is their agent.  Does not the State run the health department, furnishing the plant necessary to conduct that beneficent work, and pay all its expenses, under a system of regulation?  So, too, the State penitentiary, the lunatic asylum, the deaf and dumb institute.  Look at the post office of the general government.  Then, it is again suggested, this is a monopoly created by the State.  As to this matter it may be

suggested that such a term of monopoly as applied to a sovereign State is a misnomer.   Monopolies in the common law, and against which all Englishmen protested, were grants to individual citizens.   Here the State operates the business for the benefit of *all* her citizens.   The people are the State, the government is their agent, and any benefits under the act are enjoyed by the whole people.   It will be found on an analysis that the act of Minnesota, referred to in the leading opinion, is right; because there the State sought to absorb one of the ordinary avocations of life.   The laws of the State of Connecticut were right, because concerning the liquor trade, which no citizen enjoys as of common right.   So the law of Indiana, as cited in *Beebe* v. *State*, 6 Ind., being concerned as to the liquor traffic, was right; hence *Beebe* v. *State*, adverse to the State in the exercise of this right, has been overruled.

But there must be a close to this discussion.   A conclusion opposite to that held by the majority of this court is inevitable. Hence I must dissent.

Judgments and orders in all the cases affirmed.